## PATRICK GAINEY *et al.*

*v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Filed at Ottawa February 3, 1881.*

1. NEW TRIAL—*on evidence, in criminal cases.* In cases where the evidence is conflicting, depending upon the credibility of the opposing witnesses, the finding of the jury must be regarded as conclusive, unless it is reasonably clear that an error has been committed. It is only where the court is able to say, from a careful consideration of the whole of the testimony, that there is clearly a reasonable and well founded doubt of the guilt of the accused, that it will interpose on the ground the evidence does not support the verdict.

2. CRIMINAL LAW—*right of the jury to disbelieve testimony of the accused.* In a capital case, the jury have the right, under certain circumstances, as in this case, to disbelieve the testimony of the accused, except so far as corroborated by other witnesses, from the fact, that if guilty, he has the most powerful and urgent of motives to misrepresent the real facts.

3. SAME—*instruction as to self-defence—reference to evidence.* An instruction as to the doctrine of self-defence, almost literally in the language of section 149 of the Criminal Code, except, in place of the words in the statute, "it must appear that the danger was so urgent," the instruction read, "it must appear, *from the evidence,* the danger was so urgent," etc. It was objected that the interpolation of the words, "from the evidence," rendered the instruction bad, as ignoring how it reasonably appeared to the accused, and placing the right of self-defence upon how the facts appeared to the jury from the evidence: *Held,* that the use of those words did not vitiate the instruction.

4. SAME—*instruction ignoring apparent danger.* An instruction for the People on a trial of one upon the charge of murder, that "where the defendant pleads self-defence as an excuse for the killing, it must appear, from the evidence, that the danger was so urgent and pressing, that in order to

save his own life, or prevent his receiving great bodily harm, the killing of the other was absolutely necessary," etc., was *held*, as standing alone, to be erroneous, as ignoring the doctrine of apparent danger; but when such an instruction is only one of a series on the subject, and the law of self-defence is properly laid down in other instructions in respect to apparent danger, the error will not be ground of reversal.

5. SAME—*accused must not act from malice.* In order to show justification in taking human life in self-defence, the defendant must show to the jury the actual state of facts, whether deceptive or otherwise, which surrounded him at the time of the homicide, in order to enable them to determine whether they were sufficient to excite the fears of a reasonable person, and whether the accused, in taking the life of the deceased, in good faith really acted under the influence of those fears, and not in a spirit of revenge.

6. If the accused seek and bring on a difficulty with the deceased at the time of the killing, he will not be allowed to avail of the right of self-defence in order to shield himself from the consequences of the killing, however imminent the danger in which he may have found himself in the progress of the affray which he brought upon himself.

7. SAME—*instruction limiting difficulty where there have been two.* Where one accused of murder, and the deceased, had two difficulties or affrays on the same day of the killing, an instruction in regard to the right of self-defence, which refers to the difficulty "*at the time of the killing,*" will be sufficiently explicit to show that it was the last difficulty that was meant.

8. SAME—*presence of bailiff during the deliberation of the jury.* The presence of a bailiff in charge of a jury in a capital case, in the jury room during a part of their deliberations, is a grave irregularity and a breach of duty on the part of the officer, which will or will not vitiate the verdict, depending on the circumstances in each particular case. Where it affirmatively appears that the officer was not influenced by improper motives, and that his conduct, outside of the mere fact of being in the presence of the jury, is unexceptionable, and the court is unable to discover, after due inquiry, any thing connected with the transaction from which it may reasonably be inferred the jury were improperly influenced, or the rights of the accused prejudiced, there will be no sufficient reason for setting aside the verdict.

9. Where a bailiff in charge of a jury in a capital case, who has given material evidence against the accused upon controverted points, is present with the jury while considering of their verdict, this will vitiate their verdict where the jury find the defendant guilty, as tending to prevent that free discussion of his testimony which the ends of justice demand.

WRIT OF ERROR to the Circuit Court of Rock Island county; the Hon. ARTHUR A. SMITH, Judge, presiding.

Messrs. Kenworthy & Beardsley, for the plaintiffs in error:

A verdict against a defendant in a criminal case will not be sustained when there is a conflict upon a vital point in the evidence, if the instructions applicable to that point on the part of the People and of the accused are materially in conflict. The law must be given to the jury with accuracy, and so consistently as not to be capable of misleading.

The 13th instruction given for the People is bad. The interpolation of the words, "it must appear, *from the evidence,*" is fatal to it. No matter how fully it may have been shown that to the accused it reasonably *appeared* to be so, it must appear, *from the evidence,* that is, *to the jury,* that for the reason and purpose stated, the killing of the other *was* absolutely necessary. *Campbell* v. *People,* 16 Ill. 17; *Schnier* v. *People,* 23 id. 17; *Maher* v. *People,* 24 id. 241; *Roach* v. *People,* 77 id. 25; *Steinmeyer* v. *People,* 95 id. 383.

Nor was the error in giving it cured by the giving of another on the part of the defendant, which did state the law correctly. It has often been so declared, but we only cite the latest case,—*Steinmeyer* v. *People,* 95 Ill. 383.

The 15th instruction is too indefinite in meaning. The words, "brought on a difficulty at the time of the killing," may have been understood as referring to the difficulty at Schatz's saloon, and even if it did so refer, the offence of Gainey in soiling the hitching strap of the deceased was trivial, and did not deprive him of the right of self-defence a short time afterwards in a difficulty not brought on by him.

The verdict was vitiated by the presence of bailiffs in the room with the jury while they were deliberating upon it. *State* v. *Snyder,* 20 Kan. 306; *Cole* v. *Swan,* 4 Green, 32.

Mr. E. M. Parmenter, State's attorney, for the People:

In respect to the law of self-defence, and as sustaining instruction No. 13, reference is made to section 149 of the

Criminal Code.    *Greschia* v. *People*, 53 Ill. 301; *Adams* v.
*People*, 47 id. 379; *Davis* v. *People*, 88 id. 351; *Allen* v. *People*, 77 id. 487.

The jury could not have been in any doubt as to the law
of self-defence and its application to the plea of the defend-
ants.   On this point, the court instructed the jury fully and
as favorably to the defendants as they could desire.

Objection is also made to the People's 15th instruction
from the use of the words "brought on a difficulty at the
time of the killing."    This instruction, like all the others,
should be read in the light of the facts.    The time and place
of the difficulty are not left indefinite.    The time was the time
of the killing, and not the time of any previous difficulty.

As to the presence of the bailiff with the jury in their
room, counsel cite 2 Graham and Waterman on New Trials,
330, *Jumpertz* v. *People*, 21 Ill. 413, *Commonwealth* v. *Shields*,
2 Bush, 81, *Reius* v. *People*, 30 Ill. 274.

Mr. JUSTICE MULKEY delivered the opinion of the Court:

Patrick Gainey and Patrick Grogan, plaintiffs in error,
and James McCormac, were jointly indicted and tried at the
January term, 1880, of the Rock Island circuit court, for the
murder of Conrad Wittick, resulting in the acquittal of Mc-
Cormac and the conviction of Gainey and Grogan.    A motion
for a new trial having been overruled, the court, in pursuance
of the verdict, sentenced Gainey and Grogan to the peniten-
tiary, the former for fourteen years and the latter for his
natural life, and the present writ of error is prosecuted to
reverse that sentence.

It appears, from the evidence, that the deceased, on the
14th of November, 1879, started in a one-horse wagon from
the city of Rock Island to a place called Milan, some miles
south of Rock Island, for the purpose of getting some flour
and meal.    While on his way, and in the outskirts of the
city, he stopped, tied his horse with a halter to a hitching

post opposite Schatz's saloon, and went in for the purpose of getting a glass of beer. While in there, engaged in conversation with Schatz, plaintiffs in error, together with McCormac, came up and stopped outside. While there, Gainey and Grogan urinated against the hitching post and on the halter of the deceased. On the latter coming out of the saloon and perceiving what had been done, some warm words passed between the parties, resulting in the deceased being knocked down and kicked by Gainey. Immediately thereafter the three started off in a brisk pace, on the same route the deceased was traveling, leaving him at the saloon. The latter, after going to the door of the saloon and having some words with Schatz, got in his wagon and started off in a trot towards Milan in a south direction, over the same road the three were going, passing them about a hundred and twenty or thirty yards from Schatz's saloon, two of them being on one side of the road and one on the other. Before passing them the deceased drew from his pocket a pistol, and as he approached pointed it at them, first on one side of the road and then on the other, and, according to the testimony of the accused, snapped it once at Grogan, but no shot was fired. According to the testimony of some of the witnesses, at least two of the accused were stooping down and supplying themselves with rocks before the deceased drew or presented his revolver, while according to the testimony of the accused the revolver was drawn first. By what seems to be the weight of the testimony, the deceased had just passed the party when Grogan coming up in the rear threw a stone at the deceased which struck him in the back of the head, causing an injury from which he, on the following day, died. Upon receiving the blow, his head dropped and his body pitched forward over the dashboard, from which position the jolting of the wagon soon caused him to tumble over into the road. Without offering any aid or assistance to the deceased, they at once sought safety in flight.

A reversal is asked, first, upon the ground the evidence is insufficient to sustain the verdict. Leaving out of sight the testimony of the accused themselves, it must be conceded that the evidence otherwise fully warranted the conviction. What, if any, credit they were entitled to, was purely a question for the jury, and it having been determined adversely to the accused, this court has no right to interpose by substituting its own opinion for that of the jury. The law, whether wisely or unwisely, entrusted the consideration and decision of that question to the jury, and when it, having honestly, according to the best lights before it, performed that duty, its determination must be accepted as conclusive, unless it is reasonably clear that an error has been committed. It is only when this court is able to say, from a careful consideration of the whole of the testimony, that there is clearly a reasonable and well-founded doubt of the guilt of the accused, that it will interpose on the ground the evidence does not support the verdict. *Rafferty* v. *The People,* 72 Ill. 37.

The most important and useful function which the jury is required to perform, is to determine on which side of a controversy the real truth lies, where the testimony as to the material facts is directly in conflict and irreconcilable, and its conclusion in such case, of necessity depends largely upon the credit to be given to the opposing witnesses,—hence it is universally admitted to be the peculiar province of the jury to determine the credibility of the witnesses.

In capital cases, like the present, the accused, if guilty, has the most powerful and urgent of motives to misrepresent the real facts, and if this court is bound in every case of the kind to set aside the conviction merely because the testimony of the accused shows a case of justifiable homicide, it would not be long until there would be no security for life or limb, and trials by jury would become idle and useless ceremonies.

Conceding to the jury, then, as we do, the right, under all the circumstances of this case, to disbelieve the testimony of the accused, except so far as corroborated by other witnesses,

we are satisfied the evidence sufficiently sustains the verdict. It is next claimed that the 13th and 15th instructions given on behalf of the People are erroneous, and a reversal is asked for that reason.

The 13th instruction is as follows:

"The court further instructs the jury, that in a prosecution for murder, where the defendants plead self-defence as an excuse for the killing, it must appear, *from the evidence*, that the danger was so urgent and pressing, that in order to save his own life or prevent his receiving great bodily harm, the killing of the other was absolutely necessary; and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given."

It will be perceived that the instruction is almost a literal copy of the 149th section of the present Criminal Code. The only difference, except as to the introductory words, is that the statute says "it must appear that the danger was so urgent," etc., while the instruction reads "it must appear, *from the evidence*, the danger was so urgent," etc.

It is claimed that the interpolation of the words, "from the evidence," is fatal to the instruction. And lest we might not do entire justice to the criticism of counsel, we give it in their own words.

They say: "A fatal interpolation. No matter how fully it may have been shown that to the accused it reasonably *appeared* to be so, it must appear, *from the evidence*, that is, *to the jury*, that for the reason and purpose stated the killing of the other *was* absolutely necessary."

The italics and punctuation are counsel's.

It is substantially conceded that the instruction would be correct if the interpolation, "*from the evidence*," had been omitted. But it is supposed by counsel that the use of these words in effect repudiates the well recognized doctrine, that the right of self-defence exists as well where the danger is apparent as

real.   While the instruction, even without these words, when considered by itself, and without reference to the other instructions bearing upon that question, would doubtless be obnoxious to the objection urged, yet not by reason of the interpolation in question.   The addition of these words does not at all change the character of the instruction.   They are nothing more than what the law implies in every prosecution where the right of self-defence is relied upon as an answer to the indictment.   In every such case, where the defence is properly allowed, the state of facts set forth in the 149th section, as modified by the preceding section, must be made to appear before the court and jury trying the cause, and this can only be done by the evidence; hence the introduction of those words was entirely proper, being nothing more, as before remarked, than what the law implied without them.

The doctrine of apparent danger, as announced in the *Campbell case* and subsequent cases, does not appear in the 149th section, but it is distinctly announced in the 148th section, and therefore the former section in that respect must be regarded as modified by the latter; hence it has uniformly been held by this court, since the *Campbell case,* that an instruction, in the very language of the 149th section, if not modified by some other instruction, would be erroneous.

So, in this case, we are of opinion that the instruction in question, if considered as an independent instruction and not as a part of a series of instructions, as it certainly is, would be obnoxious to the objection that it ignores the doctrine of apparent danger.

But it is a familiar doctrine, that in passing upon a single instruction, it must be considered in connection with other instructions bearing upon the same subject, and if, when thus considered, it appears the law has been fairly presented to the jury, the court will not reverse because such instruction does not contain all the law relating to that particular subject, unless, under the peculiar circumstances of the case, the court is of opinion the jury may have been misled by it.

In the present case, the jury were distinctly told in a number of instructions that it was not necessary that the danger should be real, but that it was sufficient if it was apparent, and we are fully satisfied the jury could not have been misled by the instruction in question.

With respect to the conclusion of counsel concerning the interpolation of the words "*from the evidence,*" it may be further remarked, the object of every judicial inquiry, upon a charge of a feloneous homicide, where the defence is justification, is to present to the jury the actual state of facts, whether deceptive or otherwise, which surrounded the accused at the time of the homicide, in order to enable it to determine whether they were sufficient to excite the fears of a reasonable person, and whether the accused, in taking the life of the deceased, in good faith really acted under the influence of those fears, and not in a spirit of revenge.

When the actual facts are presented to the jury, it must determine, assuming the accused to be a reasonable person, how they appeared to him, and the jury can only judge of this from the manner in which the same facts, considered from his standpoint, appear to the jury itself. And the conclusion of the jury in every such case, when properly formed, must of necessity be based upon the evidence adduced upon the trial, and that part of the instruction to which objection is made only expresses this fact.

The instruction simply embodies a plain provision of the statute, upon one particular aspect of the case, and we fail to see any objection to it. The cases referred to upon this question do not, in our opinion, conflict with any thing we have here said.

The 15th instruction is in these words: "The jury are further instructed, that if they believe from the evidence, beyond a reasonable doubt, that the defendants sought and brought on a difficulty with Conrad Wittick, at the time of the killing, they can not afterwards avail themselves of the right of self-defence, in order to shield themselves from the conse-

quences of killing the said Conrad Wittick, if such is the proof, however imminent the danger in which they may have found themselves in the progress of the affray which they so brought upon themselves."

It is complained of this instruction, that the expression, "brought on a difficulty at the time of killing," is too indefinite,—that it does not sufficiently appear how much of what occurred between the deceased and the accused, on that day, was intended to be included in the term "difficulty."

The term, "difficulty," as applicable to what transpires between parties, when it results in some breach of the peace, or more flagrant violation of law, is in general use, and well understood by all classes. It is of constant application in legal proceedings, and in the reports of adjudicated cases. It is expressive of a group or collection of ideas that can not, perhaps, be imparted so well by any other term. Its use, therefore, avoids a great deal of circumlocution, which generally leads to confusion and misapprehension. In drawing instructions, that or some term of similar import is almost indispensable, and hence it is uniformly used in preparing instructions in all cases where it is applicable. It is true, the term might be used under certain circumstances so as to mislead, as, where the evidence shows two distinct difficulties, and the instruction fails to distinguish between them. But that is not the case here. For, even admitting that what transpired at Schatz's saloon, and what occurred down in the road where Wittick was killed, are two distinct transactions or difficulties, the instruction in question expressly limits the use of the term to what occurred *at the time of the killing*, so that it leaves no room whatever for misapprehension. If there was a distinct difficulty at the saloon the instruction had no reference to it; and whether there was or not, was a question of fact for the jury to determine. The instruction being properly limited to the difficulty which occurred at the time of the killing, we are of opinion it is not obnoxious to the objection urged against it.

It is finally urged, that the verdict of the jury should have been set aside for the reason one or more of the bailiffs having charge of the jury, were present during a portion of the time they were deliberating and considering of their verdict; and, in support of this position, the case of *The State* v. *Snyder*, decided by the Supreme Court of Kansas in June, 1878, and that of *The People* v. *Knapp*, decided by the Supreme Court of Michigan, in November, 1879, are cited.

The first case is somewhat different in its facts from the one at bar. The other can not be distinguished from the one before us. In *The State* v. *Snyder*, the bailiff who had charge of the jury, and who was present during its deliberations, had been introduced and examined as a witness on behalf of the State, and had testified to *material facts* against the accused.

In such a case, it must be admitted there are reasons, of the most imperative character, which forbid the presence of the officer during the deliberations of the jury. The probable effect of his presence, under such circumstances, would be to prevent that free and independent discussion and consideration of his testimony which the ends of justice demand and the obligations of the jurors impose. And, in any event, by reason of his official position and supposed superior knowledge with respect to the questions in controversy, his presence would necessarily incline the more timid and inexperienced jurors to refrain from the expression of any views they might have on the subject of their verdict.

In the case at bar, while it is true one of the bailiffs, who was present during a portion of the time the jury were considering of their verdict, was examined as a witness, yet it was only with reference to the plat of the town—a matter about which there was no controversy, and consequently a matter that could have provoked no discussion before the jury.

In addition to this, it is shown, affirmatively, in this case, that nothing was said or done, by either of the bailiffs who

waited on the jury, to influence or control their delibera-
tions.

The case of *The People* v. *Knapp* is placed upon the broad
ground, that the presence of an officer during the delibera-
tions of the jury, is such an irregularity and invasion of the
right of a trial by a jury as to absolutely vitiate the verdict in
all cases, without regard to whether any improper influences
were actually exerted over the jury or not. While we feel
and frankly acknowledge the force of the reasoning by which
this conclusion is reached, we are unable to fully give it our
sanction.

So far as the cases cited hold that it is improper for an
officer of the court, or any one else not a juryman, and espe-
cially one who has been examined as a witness in the cause,
upon controverted facts, to be present while the jury is delib-
erating upon the subject of their verdict, we give them our
hearty approval. But we are unable to go to the length of
saying, that if an impropriety of the kind, for any cause,
happens to be committed, the verdict is thereby, in every
case, necessarily vitiated, without regard to the conduct or
motives of the officer or the effects of his presence upon the
jury.

We prefer saying such a breach of duty on the part of the
officer is a grave irregularity, which will or will not have the
effect of vitiating the verdict, depending upon the circum-
stances in each particular case. Like most questions of that
kind, which often arise in the course of a trial, we are of
opinion it may be safely intrusted to the discretion of the court
who tries the cause, and this court would not feel at liberty
to interpose, except where it can see there has probably been
an abuse of that discretion.

Where, in a case of this kind, it affirmatively appears that
the officer was not influenced by improper motives, and that
his conduct, outside of the mere fact of being in the presence
of the jury, was unexceptionable, and the court is unable to
discover, after due inquiry, anything connected with the

transaction from which it might reasonably be inferred the jury were improperly influenced, or the rights of the accused prejudiced, we can see no sufficient reason for setting the verdict aside, thereby incurring the expense, trouble and delay of another trial.

On the other hand, when the inquiry develops any fact or circumstance which tends to show that the accused may have been prejudiced by the irregularity, the verdict should be set aside, and it would be error not to do so.

In this case, we are unable to discover anything of that kind, and must, therefore, presume that the court below properly exercised the discretion with which the law has clothed it, in cases of this character.

Believing that substantial justice has been done, and perceiving no material error in the proceedings of the court below, the judgment of that court will be affirmed.

*Judgment affirmed.*