FRANK GILMAN *et al.*

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed February 17, 1899.*

1. APPEALS AND ERRORS—*when assignment of error cannot be considered.* The Supreme Court cannot consider assignments of error with reference to rulings on objections to testimony for the State where no attempt is made to abstract the evidence upon that branch of the case, counsel having merely referred to over sixty pages of a voluminous record as containing improper questions.

2. SAME—*verdict of conviction not lightly disturbed as not sustained by proof.* It is only when the Supreme Court is satisfied, from a careful consideration of the whole evidence, that there is reasonable doubt of the guilt of the accused, that it will set aside a verdict of conviction as not sustained by proof.

3. EVIDENCE—*what not sufficient to overcome circumstantial evidence of guilt.* Circumstantial evidence of homicide showing violent treatment of the deceased in the saloon of the accused is not overcome by evidence that there were two fights that afternoon in a neighboring saloon, and that the body of deceased was found in a barn close to the heels of a kicking horse a few minutes after he ran from defendant's saloon, where there is no evidence that deceased was present at such fights and his wounds are not such as would be inflicted by a kick from a horse.

4. The court reviews the evidence in this case and declines to interfere with the jury's verdict convicting plaintiffs in error of manslaughter.

WRIT OF ERROR to the Circuit Court of Vermilion county; the Hon. F. BOOKWALTER, Judge, presiding.

J. W. KEESLAR, and MABIN & CLARK, for plaintiffs in error Gilman and Underwood.

C. M. SWALLOW, (H. M. STEELY, of counsel,) for plaintiff in error Halbert.

EDWARD C. AKIN, Attorney General, and S. G. WILSON, State's Attorney, (GEORGE T. BUCKINGHAM, C. A. HILL, and B. D. MONROE, of counsel,) for the People.

Mr. JUSTICE PHILLIPS delivered the opinion of the court:

On the 13th day of September, 1898, and a few minutes after four o'clock in the afternoon, one William Swank arrived in Westville, in Vermilion county, Illinois, from his home near Indianola, and at about half-past five o'clock of the same afternoon his dead body was found in a livery stable a short distance from the depot and near a saloon kept by plaintiff in error Frank Gilman. The plaintiffs in error, Frank Gilman, Albert Underwood and Walter Halbert, with Peter Carp and Joseph Bitius, were indicted for the crime. On trial the plaintiffs in error were found guilty of manslaughter and sentenced to the penitentiary for one year. The other two defendants were acquitted.

From the time Swank arrived in Westville, at 4:08 P. M., until he was found dead did not exceed one hour and thirty-one minutes. As far as this record shows he was sound in body and in good health at the time he arrived in Westville. At the time he was found dead there was the mark of a blow extending from the nose in a straight line across the left side of the head, just bruising the tip of the left ear. The wound was six inches in length and about one inch in breadth. It had the appearance of having been made by a smooth, round,

hard and perfectly straight instrument.    The larynx of his throat was crushed and utterly destroyed and the nose was broken.  There were no outside visible marks of the condition the larynx was in.   There were a number of small cuts, scratches and pricks upon the right side of the neck, just under the ear and jaw bone.  There were also one or two small marks or cuts on the head, and there seems to have been a bruise or mark upon the outside of the left limb, below the knee.   When he arrived in Westville he went immediately to a saloon kept by one Myers, and in a very short time went from there to a saloon kept by the plaintiff in error Frank Gilman. Here he shook a game of dice with Gilman and played a game of pool with a man by the name of Peter Johnson, and also shook two or three games of dice with the said Johnson, drinking beer or whisky in the meantime in the said saloon.   He left the saloon of Gilman about 4:45 or 4:50 P. M., according to the evidence of Gilman, and at about five o'clock he returned, and remained there until, according to the evidence of all of the defendants, he was ordered out by Gilman, and from which place he was seen by the witness Wesley Anderson coming out of the saloon door.  As he was passing out a bottle was thrown at him. He then ran in a northeasterly direction toward the door of the livery stable in which he was found dead.   This could not have been to exceed fifteen minutes previous to the time that his dead body was found.  It seems from the evidence that not more than ten minutes intervened. From where the witness Anderson stood he could not see into the door of the livery stable, but did see deceased disappear behind the office at the south-west corner of the stable and in a direct line with the west door, and he is certain that he did not pass on and beyond the north-west corner of said barn.   He must have entered the barn then and there.  When found the body was lying upon its back, with the legs, from the knees down, behind a pony, with the rest of the body lying in a vacant stall

just north of said pony. The pony stood with its head
to the east, and just behind the pony was a door opening
out of the barn. This door was fastened with a latch on
the inside, and at the time the body was found was so
fastened. There was no way to fasten or unfasten said
door from the outside. At the time Swank was in the
saloon of Gilman, and just previous to his fleeing there-
from, there were also in the said saloon the plaintiffs in
error Underwood and Halbert and Peter Carp and Joseph
Bitius. Within fifteen minutes from the time the man
was seen fleeing from Gilman's saloon the dead body was
found bearing evidence that death resulted from violence.
There were two injuries, either of which would cause
death. The evidence shows the blow on the side of the
head was given by a smooth, round, straight, hard sub-
stance. The thyroid cartilage or Adam's apple is shown
by the evidence to have been crushed. The physicians
who examined the body agree that the condition of the
larynx could have been, and probably was, produced by
choking, although a rapidly thrown missile, hard and
smooth, delivered upon the larynx, would be sufficient
to produce a wound of that kind. A blow with any hard
substance, or the fist, might also cause the injury. They
state the larynx was utterly destroyed, and in their opin-
ion the condition of his lungs showed conclusively that
this happened before he quit trying to breathe. From
this evidence it is clear the death of Swank resulted from
violence received at the hands of some person or persons.

The next question which presents itself is, does this
evidence prove the defendants guilty of that crime be-
yond a reasonable doubt? The evidence is, that Swank
arrived in Westville with a considerable amount of pa-
per money, and at the time he was playing pool with
Peter Johnson, in Gilman's saloon, the witness McKins-
try saw him changing a pocket-book from one pocket to
another, and also saw money sticking out between the
clasps of the pocket-book. This must have been very

close to five o'clock, according to the evidence of Johnson, with whom he played pool and shook dice for the drinks. When Johnson left the saloon he left Swank in there. There is nothing in the evidence to show that Swank left the saloon from that time until the time he fled from it, at the time the bottle was thrown, except the evidence of Gilman that he went out, and the evidence of Gilman and Halbert that he returned while they were shaking dice. Some fifteen minutes after Peter Johnson left the saloon,—at about 5:05 or 5:10 P. M.,—Walter Halbert came in, according to his testimony, and commenced shaking dice with Gilman for beer. He and Gilman testified that about this time Underwood and Swank came, and that in a short time thereafter Peter Carp and Joseph Bitius came in. There is conflict in the evidence of the defendants as to where Halbert and Underwood were at the time the bottle was thrown. They maintain that they were on the east side of the saloon. Carp and Bitius testified that at the time they came into the saloon, Swank, Gilman, Halbert and Underwood were all four shaking dice at the bar. Bitius went out back of the saloon after drinking a glass of beer, leaving Carp and the other four in the saloon, and when he returned everybody had gone out of the saloon except Gilman and Peter Carp. According to the testimony of Peter Carp, Gilman, Swank, Halbert and Underwood were shaking dice at the bar just before the time the bottle was thrown. According to the testimony of the three defendants only Swank and Gilman were shaking dice at that time. According to the evidence of Gilman, although they shook three games of dice, there was a continual dispute, and at no time did Swank call for the drinks at the end of either of the three games. According to the evidence of Gilman, Halbert and Underwood, during the progress of these three games the dice-box was changed. How Halbert and Underwood could have known this if they were not at the bar is not shown. It appears that Swank

did not call for the drinks on the games of dice shaken by them, although invariably the loser. The dice game broke up and Swank was ordered out of the saloon. According to the evidence of all three of the defendants, without any resistance or trouble he peaceably turned and walked across the saloon and back, and then passed out through the door. Without any provocation whatever we find Gilman hurling a pepper-sauce bottle at him just as he was leaving the door. Halbert and Underwood testified that just previous to his leaving the saloon they were on the east side of the saloon, and that Swank walked over near them when first ordered from the saloon. The physicians testified that a man injured as Swank was might have life enough left in him to make a final plunge or run for a considerable distance before falling. Dr. Fallis testified: "I don't think he would travel far, but men with terrible injuries have been known to go some little distance." Witness Anderson testifies that he saw Swank come from the saloon running in a stooped position, and that as he reached the door he was struck about the neck with a bottle. This bottle must have gone to pieces and the flying glass made the cuts on the neck and jaw. Some of the pieces also struck the door, as there were some scars made on the door by flying glass striking it. They were small scars, only removing the paint from the wood. According to the evidence of Anderson, when Swank got onto the porch he straightened up and ran rapidly and disappeared in the barn. The defendant Underwood also testifies that he saw him, after he went out of the saloon, running past the window.

Taking the evidence bearing upon the conduct of these defendants, we have Gilman, as shown by the evidence of Stark, an officer, denying that there had been a fight or trouble in his saloon. Afterwards, when confronted by the officer with the statement that there had been trouble in the saloon he admitted it. The evidence of Critchfield is, that Gilman said to Underwood to keep

still about what happened in the saloon that day. The evidence of Critchfield is that Gilman had him (Critchfield) take him (Gilman) down to the room of Walters, with whom Underwood roomed; that the latter was called from bed and struck a light, but was told from the outside to put the light out; that he went out and talked quite awhile and then returned to bed. The next morning Underwood told Walters, in answer to an inquiry, that he didn't know who it was that was there and called him out the night before, and further told him to say nothing about any one being there. There is evidence of a statement of Underwood to Anderson at the depot, just after he and Halbert came from the saloon and immediately after Swank had fled from the saloon. They wanted to know what became of that man that ran out of the saloon, and in answer to an inquiry of Anderson's as to what the trouble was over there, Underwood stated that it was none of his business. According to the evidence of Anderson, at the time Halbert and Underwood came from the saloon over to the depot "Halbert spoke up and said he would not let any strange man shake dice with him." According to the evidence of Oliver Kidd he arrived at Westville on the 5:35 train and went immediately to Gilman's saloon, where he saw Underwood, Halbert, Critchfield, Gilman and one foreigner. The first four were in a conference by themselves and were talking of a fight and also drinking beer. Kidd heard the remark made "that he got what he needed—that it would teach farmers to keep out of other people's games," and heard Gilman say that he didn't hit the man. Kidd is very positive that Critchfield, Halbert and Underwood were standing at the bar, with a glass of beer each, at the time he heard this conversation in the saloon, though this evidence is disputed by the defendants. It was argued by the defense that this evidence was not proper as to Halbert, and yet the witness Kidd says that Halbert, Critchfield and Underwood were all three standing at the bar talking with

Gilman, and that the conversation was had in the presence of all four. The evidence was competent as against Halbert.

From this evidence it is clear, not only that the death of Swank resulted from a crime, but it also shows that that crime must have been committed in Gilman's saloon and that all these defendants were present there at the time. Declarations made by them, and by others in their presence, clearly implicate them as being engaged in a difficulty in that saloon, and no other difficulty is shown therein other than the one wherein Swank was the victim. This evidence was for the jury. The plaintiffs in error contend that this evidence is not sufficient to sustain a conviction. Applicable to the facts thus shown, what was said in *McCoy* v. *People*, 175 Ill. 224, not only states the rule of law but is exceedingly appropriate. On page 229 it is said: "The law has placed the determination of that question with the jury, and it is only when this court is satisfied, from a careful consideration of the whole testimony, that there is a reasonable doubt of the guilt of the accused that it will interfere with the verdict of the jury on the ground that the evidence does not support the verdict. (*Gainey* v. *People*, 97 Ill. 270.) We are satisfied the evidence sustains the verdict of the jury, and that the jury would have been justified in inflicting, under the evidence in the record, a much heavier punishment."

The only evidence attempted to be introduced by the defendants was that the deceased was found dead behind a vicious mare that was in the habit of kicking, and that in another saloon near Gilman's saloon two fights occurred that afternoon. There was no evidence to show the deceased was present at either of those fights, nor is there any evidence to show the bruises inflicted were of a character that could be caused by the kick of a horse, but the evidence shows, on the contrary, that the bruises could not have been so caused.

Counsel for plaintiffs in error complain of the rulings of the court in reference to objections to testimony for the State.    Counsel have not, however, done more than refer to a record which comprises over five hundred pages, and their reference to that record is by the page thereof, without allusion to the particular ruling.   No effort has been made to abstract this branch of the evidence. Over sixty pages are referred to as containing questions objected to, and not a single question is abstracted or pointed out.  We cannot consider the assignments of error on this branch of this record.

It is objected that the bailiff in charge of the jury was in the jury room and made a map showing the location of the different points referred to in the evidence.   A careful reading of the affidavits in support of a motion for a new trial on this branch of the case shows that the map was made by one of the jurors, and that the bailiff took no part in the deliberations of the jury or in making or explaining the map.   This error is not well assigned.

Error is assigned in giving instructions for the State and in modifying and refusing instructions asked by the defendants.  Thirty-six instructions were given in behalf of the People, many of them being a definition of murder and manslaughter, etc.   The defense asked thirty instructions, some of which were given as asked and others modified and given.  Fourteen were refused.  The instructions given for the defense covered every phase of the case, and from a careful examination of them we find no error in the giving, modifying or refusing of instructions.

The evidence supports the verdict and we find no error in the record.   The judgment of the circuit court of Vermilion county is therefore affirmed.

*Judgment affirmed.*