THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAMUEL SIMPSON, Plaintiff in Error.

*Opinion filed December 22, 1915.*

1. CRIMINAL LAW—*when jury are sufficiently advised as to law of self-defense.* In a murder trial the jury are sufficiently advised of the law of self-defense where the court, in connection with an instruction containing sections 148 and 149 of division 1 of the Criminal Code, gave an instruction stating that men threatened with danger are obliged to judge from appearances, and that the defendant would be justified in the homicide if the circumstances were such that a reasonable person would have reasonable ground to believe he was in danger of losing his life or suffering great bodily injury.

2. SAME—*when a motion for new trial is properly denied.* A motion for a new trial on the ground of newly discovered evidence, consisting of the testimony of two witnesses as to threats made by the deceased against the defendant and that the deceased had a loaded revolver when he was talking to one witness, is properly denied, where the defendant testified on the trial as to the threats by the deceased and it is beyond question that the deceased had no revolver at the time of the homicide.

3. SAME—*defendant should ask for a continuance if attendance of witness cannot be secured for the trial.* Where a subpoena has been served on a witness for the defendant but the attendance of the witness at the trial cannot be procured, the defendant should ask for a continuance instead of waiting until after judgment and then moving for a new trial to enable him to have the testimony of such witness.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN M. O'CONNOR, Judge, presiding.

SHORT, DAVIS & RUST, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and GEORGE P. RAMSEY, for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

The plaintiff in error, Samuel Simpson, was indicted and tried in the criminal court of Cook county for the murder of Louis Buchanan and was convicted of manslaughter. He has brought the record by writ of error to this court for review.

At the trial defendant admitted killing Louis Buchanan between five and six o'clock in the afternoon of Monday, May 12, 1913, by shooting him with a 38-calibre revolver, but claimed that he killed him in self-defense. The defendant and Buchanan were negroes, and at the time of the homicide Buchanan was walking west from State street on the north side of Thirty-third street, and, having crossed toward the south side of the street, continued west along the middle of the street. The defendant came north on Dearborn street,—the next street west of State street,— carrying a suit-case, overcoat, rain-coat and umbrella. He came into Thirty-third street and crossed to the north side of the street, going east toward State street. When he and Buchanan were about twenty or twenty-five feet apart, near the alley running north and south between State and Dearborn streets, the shooting occurred. There was one witness of what then happened, who testified for the People. He appeared to be free from any bias or partiality, and if he had any prejudice it was against Buchanan, who was a gambler and confidence man, and who, the witness said, had cheated him out of $30 by shooting craps with loaded dice.

That witness testified that he was going to a saloon for beer and went into the side entrance of the saloon; that when he first saw the defendant he had a revolver in his right hand and was in a bending position, setting his suit-case down and motioning with his left hand toward Buchanan as if to keep him back. The witness turned to go down the alley, when he heard two shots, and looking back he saw the defendant shooting and walking toward Buchanan, who was standing still, with his right hand up and his left hand in the region of his abdomen. The first two shots were followed in quick succession by three others, and Buchanan walked over to the south side of the street and sat on the steps. Buchanan was taken to a hospital and died the next day. There were two shots in each arm and the fatal shot was in the right side. It entered at the ninth rib and took a downward course through the liver, above the kidney, and finally lodged near the femoral artery on the left side of the body.

The defendant and two others testified for the defense concerning the occurrence. One witness said that he was standing at the northwest corner of Thirty-third and Dearborn streets when he saw a man with a suit-case coming north on the east side of Dearborn street; that the man turned and went east on Thirty-third street, and a heavy-set, dark-skinned man was coming west on that street and told the man with the suit-case to wait a minute,—that he wanted to see him; that the man with the suit-case told the other to stay off of him, and the other man called him a vile name and said he was going to kill him, and made for his belt; that the man with the suit-case dropped it and knelt down and commenced shooting, and the heavy-set man threw his hand out and staggered and then sat down on the steps. The other witness, an undertaker, who was at the inquest upon the body of Buchanan and who did not reveal anything that he knew at that time or until the trial, said that Buchanan went along Thirty-third street, and

when he got to the alley went down the middle of the street; that the defendant came around the corner from Dearborn street and started east, with a suit-case in his hand and an overcoat on his arm; that Buchanan said to the defendant he wanted to see him, and the defendant said to get back and leave him alone; that the defendant stopped and squatted down and drew his revolver; that Buchanan called the defendant a vile name and said he was going to kill him, and Buchanan had his hand down in front of him, and when he made that motion the defendant fired; that Buchanan had his right hand up and did not stop going toward the defendant until the third shot was fired, when he turned and went to the south sidewalk.

The defendant, testifying in his own behalf, told of a difficulty between Buchanan and himself on the morning of the day of the homicide. The defendant was a married man, having a wife and five children, but had been rooming at 3323 South Dearborn street in a house occupied by Mr. and Mrs. Johnson, Cora Marshall and Lydia Dorsey. Cora Marshall had for years been a notorious character in the neighborhood and went by the name of Big Sis, and Lydia Dorsey lived with her and passed as her daughter, although she was not, in fact, her daughter. The defendant testified that Buchanan had been in Dayton, Ohio, at the time of a flood, and on that Monday morning came to the defendant's bed-room, where he was in bed, and said that the defendant had got the woman and that he ought to kill him and her too; that the defendant had bought strawberries and chicken for her and she had given them to him; that she brought him a dinner and he threw it out and broke the dish. The defendant protested against the charges and denied having the woman, and they talked about a wager with reference to something that Buchanan charged the defendant with having told a lieutenant. The defendant said that Buchanan told him that he should not stay there, and if he was there when he came back he would

kill him. After Buchanan left, the defendant got up and left the house, but said that he had to wait until the woman came back in the afternoon, between five and six o'clock, as he had no key, and he then packed up and explained things to her. He said that he had arranged for another room at Twenty-second street, and took his suit-case, overcoat, rain-coat and umbrella and left the house, putting the revolver, which was in the suit-case, in his overcoat pocket. His account of the homicide was, that when he turned from Dearborn street into Thirty-third street he saw Buchanan coming along the street toward him; that Buchanan said he wanted to speak to him, and he told Buchanan to stay back and waved his hand at him; that Buchanan called him a vile name and said he would kill him and started toward him, putting his hand down his trousers in front, under his vest, as if to get something; that the defendant dropped the suit-case, got his revolver out of his overcoat pocket and shot.

No witness saw any revolver or weapon of any kind in the possession of Buchanan and there was none on his person after he was killed. One witness for the defense testified that he saw a tall, brown-skinned man grab something from Buchanan and run north. Another witness said that he saw a brown-skinned fellow run up the alley with a shiny gun, but he admitted that he had no knowledge where the brown-skinned man got the gun. This evidence was introduced to raise an inference that Buchanan had a revolver which was taken from his person by the brown-skinned man after the shooting, but a witness for the defendant who said he was the first one to reach Buchanan after the shooting did not see anything of a brown-skinned man taking a weapon from him. The jury would not be likely to pay any attention to the story of the mythical brown-skinned man running up the street with a shiny revolver and who was never heard of again. All the witnesses, including the defendant himself, were agreed that at least

after the third shot Buchanan had his right hand up, and it is certain that he had no weapon in either hand. The defendant kept on shooting him after he held his hand up, and the fatal shot in the right side was evidently given after the second or third shot, when he turned to go toward the sidewalk. The officer who arrested the defendant testified that the defendant told him about the trouble in the morning and that he met Buchanan in the afternoon and commenced pumping away at him. If the jury gave full credit to the testimony of the defendant about the occurrence in the morning it only tended to prove that Buchanan's demand was that he should keep away from the house, and his threat was that if he found him there he would kill him. He had left the house and was coming away from it at the time he met Buchanan, and at any rate there is no doubt that he continued shooting when there was no danger or appearance of danger whatever. The jury were justified in finding that the mortal wound was inflicted when Buchanan had his hands up and was turning away. The evidence justified the verdict.

Errors are assigned on the giving of instructions at the request of the People, and the objection is that some of them ignored the doctrine of apparent danger. The court gave to the jury sections 148 and 149 of division 1 of the Criminal Code, relating to self-defense, which have been held to fairly state the law in that respect. In connection with the instruction containing those sections, instructions offered by the People were given which fully and clearly advised the jury that if the circumstances were such that a reasonable person would have had reasonable ground to believe that he was in danger of losing his life or suffering great bodily harm the defendant would be justified in the homicide, and that men threatened with danger were obliged to judge from appearances. There was no error in thus instructing the jury. *Gainey* v. *People,* 97 Ill. 270; *Kinney* v. *People,* 108 id. 519; *McCoy* v. *People,* 175 id.

270 — 35

224; *Kipley* v. *People,* 215 id. 358; *Parsons* v. *People,* 218 id. 386.

There was a motion for a new trial on the ground of newly discovered evidence and the motion was denied. It was supported by the affidavits of Cora Marshall and Benjamin F. Perno. Cora Marshall stated that she was in Michigan at the time of the trial and did not know that it was in progress and that it was impossible for the defendant to find her. Perno, an employee of a firm of liquor dealers in the vicinity of the homicide, stated that it was impossible for the defendant to have any knowledge of the testimony which he would give on another trial; but the defendant failed to inform the court whether he had any knowledge of the evidence or what efforts he had made to learn of material evidence in his behalf. Necessarily, no one but the defendant knew whether he had any knowledge of the facts proposed to be proved by these witnesses or what effort he made to find Cora Marshall. He had served a subpœna on her and knew that she was to be a witness, and if her attendance could not be secured for the trial he should have applied for a continuance. It was proposed to have Cora Marshall testify to a quarrel she had with Buchanan on the day of the homicide and to threats against the defendant made by Buchanan. The quarrel was testified to by a keeper of a grocery store where it occurred, and the fact of previous threats was proved by the defendant and not denied. The testimony to be given by Perno was that shortly before the shooting Buchanan had a loaded revolver and said that he was going to kill the defendant for trifling with his girl, Cora Marshall. It is beyond question that he had no revolver when he was killed, and the threat belonged to the same class as other undisputed evidence. The court did not err in denying the motion for a new trial.

The judgment is affirmed.     *Judgment affirmed.*