WILLIAM HENRY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 25, 1902.*

1. MURDER—*one who begins affray cannot shield himself behind doctrine of self-defense.* One who brings on an assault, and when he finds the person assaulted is armed and ready to defend himself, produces a deadly weapon and kills him, cannot escape the consequences of the killing by setting up a claim of self-defense.

2. SAME—*when a judgment of conviction should stand, on appeal.* If the evidence, aside from that of the defendants, would, if true, justify the verdict of the jury, whereas the testimony of defendants, who were jointly indicted, would, if true, require a reversal, the Supreme Court will not interfere with the verdict unless it is clear that error has been committed.

3. CRIMINAL LAW—*regular panel need not be in attendance when jury is being selected from special panel.* The statute does not require that the court have a regular panel in attendance while a jury is being selected from a special panel, which has been drawn in accordance with the provisions of the statute.

4. SAME—*when irregularity in mode of selecting jurors will not reverse.* An irregularity in the mode of selecting jurors does not require a reversal of a judgment of conviction if no prejudice is shown to have resulted to the accused from such irregularity.

5. SAME—*when denial of motion for a separate trial is not prejudicial.* The denial of a motion for a separate trial, asked on the ground that the party would thereby have the benefit of a certain witness untrammeled by the fact that he was the husband of the party's co-defendant, is not prejudicial, where such witness is allowed to give his testimony without objection on the part of the People.

6. SAME—*motion for a separate trial is addressed to discretion of the court.* A motion for a separate trial in a criminal case is addressed to the sound discretion of the court, and its action is not subject to review unless such discretion is abused.

7. SAME—*when proof of prior occurrence is admissible to show animus.* On a trial for murder, proof that the accused attempted to stop the deceased in the street two days before the killing, and that he ran after him, called him vile names and threatened to "get him yet," is admissible for the purpose of showing the animus of the accused towards the deceased.

8. SAME—*when conviction will not be reversed for improper remarks by State's attorney.* Improper remarks by the State's attorney with reference to the disappearance of a revolver claimed to have been

in the possession of the deceased will not reverse, where the court instructed the jury to disregard any statements not supported by the evidence, and there is nothing to show that the minds of the jury were prejudiced in any way thereby.

9. SAME—*right to exhibit clothes of deceased, and buggy in which he sat, to the jury.* Where deceased was killed by a shot-gun while sitting in his buggy, it is proper to permit the buggy to be produced in court and shown to the jury, to enable the witness to explain. the position of the deceased, the position of the accused and the range of the charge of shot, which passed through the body of the deceased and lodged in the back cushion; also to exhibit the clothing of the deceased, showing that it was burned by the powder.

10. SAME—*law does not make a distinction between actual and apparent self-defense.* The law does not make a distinction between actual and apparent self-defense, but between danger which is real and danger which is apparent.

11. SAME—*when not error to give instruction defining murder.* If the jury are fully instructed as to their right, under the indictment, to find the accused guilty of manslaughter, it is not error to give an instruction giving the definition of murder, where there is no requirement in the instruction that the jury should find the accused guilty of murder.

12. SAME—*instructions should be considered as one charge.* It is sufficient if the series of instructions in a criminal case, considered as a whole, fully and fairly announce the matters of law applicable to the theory of the prosecution and the defense.

13. SAME—*reasonable doubt must be as to the whole evidence.* The reasonable doubt which the jury are permitted to entertain must be as to the guilt of the accused on the whole evidence, and not as to any particular fact in the case.

14. SAME—*rule as to defendant's credibility and interest.* Although co-defendants have a right to be sworn and to give testimony in their own behalf, the jury are not bound to believe their testimony, although they must give it such weight as it is entitled to; and their credibility and the weight to be attached to their testimony are matters exclusively for the jury, in determining which the jury may consider their interest in the result of the trial.

15. SAME—*when instruction as to claim of self-defense is proper.* It is proper, in a murder trial, to instruct the jury that if they believe, from the evidence, beyond a reasonable doubt, that the defendant brought on the difficulty between the deceased and himself at the time of the killing, and that the defendant was the first assailant, he cannot avail himself of the right of self-defense, however imminent the danger in which he found himself in the progress of the affray, unless he in good faith endeavored to decline further struggle before the mortal shot was fired.

16. SAME—*when killing is not justifiable.* Even if the deceased was armed with a revolver at the time of the killing and made the first attack upon the accused, yet if, at the time the mortal shot was fired by the accused, it was not necessary or apparently necessary in order to save his own life or prevent his receiving great bodily harm, the killing is not justifiable under a plea of self-defense.

17. SAME—*an instruction must be considered in connection with others.* In determining the propriety of an instruction it must be considered in connection with the other instructions upon the same subject, and if the law has been fairly presented, the fact that the instruction objected to does not contain all the law on the subject will not be ground for reversal unless the peculiar circumstances of the case render the instruction misleading.

18. SAME—*when refusal of proper instructions not ground for reversal.* The refusal of correct instructions is not ground for reversal if others stating correctly the same principles are given; nor need the court repeat the same instruction for both parties.

19. SAME—*court not required to instruct the jury on every question in the case.* Where evidence of a previous transaction between the accused and the deceased is admitted to show the animus of the accused towards the deceased, it is proper for the court to refuse an instruction limiting the attention of the jury to the words used by accused at the time, and requiring them to determine whether such words amounted to a threat or intention then deliberately formed to kill the accused.

20. SAME—*what not ground for new trial.* If there is testimony in a murder trial to the effect that the deceased had a revolver in his possession and that it was fired at the time of the difficulty, it is not ground for a new trial that certain parties have since found a revolver in the road near where the killing took place, which the defense desire to introduce in evidence.

21. SAME—*newly discovered evidence must be conclusive in its character.* Newly discovered evidence, in order to justify the granting of a new trial, must be clearly conclusive in its character.

WRIT OF ERROR to the Circuit Court of Pike county; the Hon. FRANK K. DUNN, Judge, presiding.

This is an indictment for murder, found by the grand jury of Pike county at the November term, 1900, against the plaintiff in error, William Henry, and one Minnie Henry. Plaintiff in error, William Henry, and Minnie Henry were indicted jointly for the murder of one Charles Jennings on June 18, 1900. The case was tried at the November term, 1901, of the Pike county circuit court.

The jury returned a verdict, finding Minnie Henry not guilty, and finding the plaintiff in error, William Henry, guilty, and fixing his punishment at twenty-one years' imprisonment in the penitentiary. A motion for new trial was overruled, and sentence and judgment were rendered in accordance with the verdict. The present writ of error is sued out for the purpose of reversing such judgment.

The plaintiff in error, William Henry, was the brother-in-law of the deceased Charles Jennings. Alice Jennings, the wife of Charles Jennings, was the sister of plaintiff in error. Minnie Henry was the daughter-in-law of plaintiff in error, being the wife of plaintiff in error's son, Charles Henry. In June, 1900, plaintiff in error lived in Nebo in Pike county. Charles Jennings lived upon a farm owned by his wife, Alice Jennings, situated about five miles south-west from Nebo, and about the same distance south-east of Pleasant Hill, Pleasant Hill being about five miles west of Nebo. Plaintiff in error owned a farm lying just north of, and adjoining, the farm of Charles Jennings and his wife, situated, as we understand the evidence, upon the road running north-west to Pleasant Hill. Upon this farm, so owned by plaintiff in error and lying north of the Jennings farm, Charles Henry and his wife, Minnie Henry, lived, Charles Henry being a tenant of his father, and apparently working the farm under the direction of his father. There was a small house on the plaintiff in error's farm on the east side of the Pleasant Hill road, and about a quarter of a mile north or north-west from the house where Jennings and his wife lived on their farm.

For some reason plaintiff in error and his sister, Alice Jennings, had not been on friendly terms for several years. He had not spoken to her for three years prior to June, 1900. Some ill-feeling also existed between Alice Jennings and her niece by marriage, Minnie Henry. On Thursday, June 14, 1900, some cows, belonging to Charles

Henry, strayed into a wheatfield, belonging to Charles
Jennings and being a part of the farm, on which he lived
with his wife. These cows trampled down or injured the
wheat of Jennings, and were taken up by him and im-
pounded or distrained. Minnie Henry went over to the
Jennings farm after these cows, and, while she was there,
some altercation occurred between her and her aunt-in-
law, Alice Jennings. Upon that occasion Mrs. Jennings
ordered Minnie Henry to leave her premises, because, as
the former says, of abusive language used toward her by
Minnie Henry. Minnie Henry swears that Mrs. Jennings
called her a vile name, and set a dog on her and drew a
revolver on her; but Mrs. Jennings, while admitting that,
at the time, she had a stick of wood in her hand, and her
dog was by her side, says she did not set the dog on
her, nor threaten to shoot her. Whatever may have been
the actual fact as to what was said and done on Thurs-
day, June 14, the occurrence of that day was reported to
plaintiff in error William Henry, and aroused a feeling of
anger in his breast against his sister and her husband.

On Saturday, June 16, in the afternoon Charles Jen-
nings and his wife were in Nebo. They were together in
a phaeton drawn by two horses. They rode up the main
street, which ran north and south, until they came to a
street running east and west, when Jennings turned his
horses to the west and drove westward. At the corners
where he turned to the westward there are two stores,
both fronting east, one, owned by a man named Turn-
baugh on the north side of the street running west, and
the other, owned by a man named Marion and located on
the south side of the street running west. Plaintiff in
error and his wife were at that time upon the porch of
the store of Turnbaugh. When Jennings and his wife
passed to the westward plaintiff in error saw them. He
came down from the porch and ran toward the buggy
or phaeton, calling upon Jennings to stop. The wife of
plaintiff in error, standing by, caught him by the sleeve,

and tried to restrain him, begging him to let them go. In her effort to stop her husband she tore the sleeve of his shirt. He replied, "I won't let them go." He tore himself loose from his wife, and hollered, "Hold on there, you damned son-of-a-bitch." He was seen to stoop to the graveled street, as if reaching to pick up a rock, and followed some little distance to the west in the direction of the buggy or phaeton. As he followed, he used oaths, and exclaimed "I'll see you. I'll get you. Go, God damn you, I'll get you yet." Jennings drove on, and stopped at the house of a man, named Franklin, where he remained some fifteen or twenty minutes, and then went to Pleasant Hill, reaching there late in the afternoon. When plaintiff in error found that Jennings refused to stop when he called to him, he finally returned to the store of Turnbaugh, which he had left in the manner already stated.

While Charles Jennings, who is shown by the evidence to have been a weakly or sickly man and to have weighed about one hundred and thirty-five pounds, was in Pleasant Hill, he bought ten cents' worth of cartridges, and, when asked by some one, if he was going to kill anybody, said "No," but that "he intended to defend himself if he was attacked." Charles Jennings then referred to the occurrence, which had taken place just before in Nebo, and said that he was the person, whom William Henry "was after." One witness says that Jennings stated to him that he did not know what was the matter with the plaintiff in error, unless some one had been telling him lies. He also said that it was not necessary for him and plaintiff in error to have any trouble, and made this remark to the person with whom he was talking: "But you know, when Bill goes at a man, he wants to go to cut or shoot," and the person, to whom he was talking, replied, "Yes, that's Bill."

On the next day, Sunday, June 17, the deceased, Charles Jennings, remained at home. The plaintiff in

error on Sunday morning went down to the farm occupied by his son, Charles Henry. The proof tends to show that he did not then see Charles Henry, and returned to his home in Nebo. On Monday morning the deceased Charles Jennings, having some wheat to sell, sent the same early in the morning to Pleasant Hill in a wagon. A little later, and between seven and eight o'clock, he started to Pleasant Hill in a phaeton, drawn by two horses, to look after the sale of the wheat, which he had so sent forward. His wife, Alice Jennings, was in the buggy or phaeton with him, desiring to take a ride to Pleasant Hill. On the same Monday morning, the plaintiff in error came down from Nebo with a horse and buggy to the farm, occupied by his son Charles Henry and the latter's wife, Minnie Henry, lying, as above stated, just north of the Jennings farm. As Jennings and his wife drove towards the Charles Henry farm, where in a part of the yard plaintiff in error had hitched his horse and buggy, a meeting took place between the deceased Charles Jennings and the plaintiff in error, which resulted in the shooting of the former by the latter. As to what occurred in the roadway between the deceased, Charles Jennings, and the plaintiff in error before the death of the former, there is a conflict in the testimony.

Alice Jennings, in her direct examination, when on the stand as a witness, testified as follows: "As we got in sight of Charley Henry's house, we saw Bill Henry come out of the house, in the road stooping over as if he were picking up something. I could not tell just at the time what he was picking up. He came on down the road to meet us, more of a run than a walk, I would call it. He would run a step or two and then walk fast. He came about eighty steps down the road to meet us. As he came in front of the horses, he threw a rock at us out of his right hand, grabbed one of the horses by the bridle bits, saying 'God damn your hearts to hell; you damned black sons-of-bitches.' He walked backward cursing us

all the while.  My husband was pleading, 'Now, Bill, I don't want to have any trouble with you; if you will only listen I will explain.'  No, he would not listen.  My husband came over that four or five times; I don't know how many times, until we got in front of Charley Henry's house, and then he stopped the horses.  He let loose of the bridle bits, ran back and grabbed the lines out of my husband's hands, and my husband said, 'Bill, if you will only listen, I will explain.'  He said, 'Where did them cows get on your corn at?'  My husband said, 'They never got on my corn, they got on my wheat.'  Bill says, 'Where in hell is your wheat?'  My husband says, 'A little patch upon the hills by the corn.'  He says, 'Oh, hell; bring me my shot-gun; be God damned if I don't shoot you both.'  I looked up to see who would bring the gun, and saw Charley Henry's wife in the yard in front of the house.  She went in and got the shot-gun, and brought it to the buggy.  He takes the gun with his left hand, dropped the lines with his right hand.  As he dropped the lines, I grabbed them, and then he stepped back, and then he fired the shot-gun.  The horses sprang forward and run, and I heard him say, 'Hold on there, God damn you, I want to wind both of you up.'  My husband fell back behind me, gave two groans and never spoke a word.  I kept the horses in the road until I got to Mrs. Guthrie's, and there I saw Mrs. Guthrie standing on the porch looking down the road.  I called her to help me.  She came out to the road, and we ran the horses into the bank next to the tree, and the tongue of the buggy broke, and we managed to get them tied.  As I stepped out of the buggy I noticed smoke behind me.  I noticed my husband was on fire.  I ran into the house as Mrs. Guthrie ran to the field for her husband.  I got a bucket of water and dashed it against my husband's face, and when Mrs. Guthrie came I asked her to do something for me, but my husband was dead."

The plaintiff in error testified as follows: "I tied my horse.  Minnie came to the door and I asked her where

Charley was, and she said he was down in the field plow-
ing.   I told her I wanted to see him a bit, and I turned
around and started and got into the road when I saw
Charley Jennings and his wife coming.   I walked on
down until I got even with them, and I stepped up to
speak with Charley.   I put my hands on the wheels of
the buggy.   I asked him what he put up Charley's cows
for.   He said because they got into his wheat.   I said,
'Where is your wheat?' and he said, 'Up on the hills by
the corn,' and I said, 'There was no such a damned thing.'
She said, 'Shoot him—shoot the God damned son-of-a-
bitch.'   She grabbed the lines out of his hands, and he
reached down and got a revolver and fired.   I ran around
in front of the horses, and they after me.   I got to my
buggy and called to Minnie to bring me my gun.   When I
got to my buggy I dodged around that, and she brought
me the gun.   I wheeled around with the gun.   I saw the
revolver pointed at me and I fired."   When asked why
he fired, he said, "Because he was making an attempt to
shoot me."

Minnie Henry says that plaintiff in error came to the
place and tied his horse at the gate-post in the south-
west corner of the yard, around which there was no fence
at that time, the post being at the corner of the horse lot
and the horse being headed south-east and hitched to
a buggy-post standing just out of the track north-west.
She says that her husband was in the cornfield south-
west of the house half a quarter away, and, when Wil-
liam Henry inquired for him, she told him where he was.
She says that the plaintiff in error did not come into
the house, and was tying the horse when he asked where
Charley was.   She states that at that time she was in the
front door of the house facing west, and that the house
contained one room; that Mr. Henry started to the field
where Charley was, and that the usual way to go was
down the big road and then down to the field.   She also
stated that, when the plaintiff in error started, she turned

back "to my dishes." She further proceeds to testify that she did not notice any one coming up the road, but, as her table was a couple of steps only from the door, she heard some one say something, and thinking it was plaintiff in error calling her, she stepped to the door and saw Mr. and Mrs. Jennings in the buggy and plaintiff in error between the wheels at the side of the buggy. Her testimony is as follows: "I stepped to the door and saw Mr. and Mrs. Jennings in the buggy and Mr. Henry between the wheels at the side of the buggy. I heard Mr. Henry say, 'What in the hell did you put Charley's cows up for?' Mr. Jennings said, 'Because they were in my wheatfield.' Mr. Henry says, 'Where is your wheat?' He says, 'Up on the hill by the corn.' He said, 'They were not any such a damned thing.' Mr. Jennings said, 'They were too.' Mrs. Jennings said, 'Shoot the damned son-of-a-bitch,' and grabbed the lines out of his hands. Then Mr. Henry dashed in front of the horses. When she took the lines out of his hands, he grabbed around for the revolver. I can't tell just which way. I saw him pick the revolver up, and Mr. Henry jumped and went in ahead of the horses and got out of the way. Just as he jumped Mr. Jennings shot. When he got in front of the horses, he hollered for me to bring the gun. He run right ahead of the horses, Mrs. Jennings driving right along after him. They wheeled the horses in after him as he got to the house, and I came there with the gun, and Mr. Henry wheeled round and shot as Mr. Jennings was ready to shoot again. I met him with the gun just back of his buggy. The distance from the door to where I met him was eleven yards."

Mrs. Jennings further says, "After we got up to Guthrie's place, while we were trying to get the horses reconciled, my brother passed. Mrs. Guthrie says, 'For God's sake, stop and help us.' He went by us as fast as the horses could go. * * * At the time Henry let loose of the bridle bits and came back and grabbed the lines

out of my husband's hands, the buggy was cramped to the left. He stopped the buggy a little bit south-west from the house. There is a window in the south side of Charley Henry's house." The buggy in question was in the court room at the time of the trial and the witness, going to the buggy, said: "That is the hole the shot-gun made after the shot went through my husband. It is ten inches from the bottom of the seat up to the hole. The hole is sixteen inches from the right side of the cushion. At the time the shot was fired the buggy was cramped to the left. William Henry stood at the time he fired on the right side of the buggy and stepped so, back from being between the wheels. * * * One shot was all I heard on that occasion of any kind. I know it was a shot-gun. It was only shot off once. I saw and heard a shot-gun fired. I never heard more than one shot fired during the whole time. I am sure of that. * * * I am not positive that he took a revolver with him on that occasion. As William Henry came down the road to meet us he was stooping over and picking up something. * * * He was in the track of the road when I first saw him stoop, south of the little walnut tree. We were still down the road and were afraid of him. He came on down toward us carrying something in his hand. He would run a step or two and then walk fast. My husband slowed the team up, walking them in a slow walk. The road is level along there. It frightened the horses a little when he throwed. He did not curse any until he grabbed the horses and threw the rock. When he threw the rock it scared the horses some. They jumped a little to the left. It was a fractious team. * * * Henry took hold of the right horse with his right hand. * * * We were about twenty or twenty-five steps north of the Hunter shanty, maybe not so far. * * * He held the horses by the bits until he walked backwards up there. Me and Charley were sitting in the buggy while he was holding the bits. I don't know where the revolver was. I never seen it.

We then owned a revolver. He had it six or seven years. I knew where it was kept. I did not look for it that morning. I suppose it was in the place where he always kept it. * * * When he threw the rock the horses jumped a little to the left, but they did not get the buggy out of the track at all. Charley had hold of the lines. William held to the horses by the bits, and the team just walked on. William led the team by the bits eighty steps, just walking along there. He was walking out to one side a little past the horses' heads, on the east side. He walked backwards. He took the right-hand horse by the bridle bits by the right hand, walking backwards and cursing us. He walked eighty steps that way. The horses were not fretting at that time. Charley was holding the lines. The whip was in the socket. * * * He kept the buggy in the track eighty steps, and he walked on the side of the track. When he got there, he stopped. That was north of the little ditch. * * * He stopped the horses and let loose of the bits. Me and Charley was sitting there in the buggy, Charley hold of the lines. Charley was on the east side and me on the west side. He let go the horses' bits and ran quickly back to the buggy. As he grabbed the lines, the horses turned to the west. It might have been half a second between the time he let go the bits and the time he grabbed the lines. If we had gone on we would have gone over him. Did not want to hurt him. * * * Charley never said nothing or done nothing after he seen he could not reason with him. We were sitting in the buggy quietly. Charley Henry's wife brought the gun. She brought the gun to him in the road six or seven steps from the little walnut tree. When we saw her coming with the gun, Charley and I sat quietly in the buggy. I don't think Charley made any effort to shoot. We saw the gun coming down the hill. William was standing between the wheels, and she came near enough to hand him the gun. He took the gun with his left hand, and let loose of the lines with

his right hand. I grabbed them the instant he let loose.
\* \* \* I don't know that Charley had the revolver in
his hands is the reason he did not take the lines. \* \* \*
I do not know what Charley was doing while I grabbed
the lines. \* \* \* When William took the gun he took
a step or two back."

W. E. WILLIAMS, JEFFERSON ORR, W. L. COLEY, W. H.
CROW, and EDWIN JOHNSTON, for plaintiff in error:

When the evidence is conflicting the law should be
stated accurately. *Hoge* v. *People*, 117 Ill. 47.

Erroneous instructions which are conflicting will not
be amended or cured by correct instructions. *Steinmeyer*
v. *People*, 95 Ill. 383; *Enright* v. *People*, 155 id. 36; *Railway
Co.* v. *Morgan*, 72 id. 355.

The court should not invade the province of the jury.
The jury should be left free to determine whether the
facts amount to murder or manslaughter, and should not
be limited as to the right of self-defense. *Panton* v. *People*, 114 Ill. 505; *Lynn* v. *People*, 170 id. 537.

An instruction that limits the right of self-defense to
actual danger is not the law. *Steiner* v. *People*, 187 Ill. 244.

The jury should be left free to find whether the crime
is murder or manslaughter. *Lynn* v. *People*, 170 Ill. 537.

An erroneous instruction which limits the law of self-
defense is not cured by a correct instruction. *Steinmeyer*
v. *People*, 95 Ill. 388.

The court should not tell the jury that they ought or
ought not, or that they are bound or are not bound, to
believe certain testimony. *Otmer* v. *People*, 76 Ill. 150.

Facts should not be assumed in an instruction. *Roach*
v. *People*, 77 Ill. 29.

The burden of proof is always on the People. Whether
the killing is proved or admitted, the burden is still on
the People. *Halloway* v. *People*, 181 Ill. 544.

An instruction putting the burden of proof on the de-
fense is erroneous. *Alexander* v. *People*, 96 Ill. 98.

Where the evidence is conflicting the instructions should be accurate, and the jury should not be told in an instruction that if they believe a certain state of facts it would amount to murder. *Smith* v. *People*, 142 Ill. 122.

In a capital case it is the duty of the presiding judge to declare the law, and if the instruction asked is not in conformity to the judge's view of the law the judge should modify it or prepare a new one. *Peri* v. *People*, 65 Ill. 26; *Leuder* v. *People*, 6 Ill. App. 98.

While a court of review will always hesitate to set aside a conviction for improper remarks of counsel, yet in a case like this, where there is reason to fear that the verdict was not the result of a dispassionate consideration of all the evidence in the case, it becomes material and substantial error. *Raggio* v. *People*, 135 Ill. 533.

H. J. HAMLIN, Attorney General, and A. CLAY WILLIAMS, State's Attorney, (MATTHEWS & GRIGSBY, A. G. CRAWFORD, and J. W. STAUFFER, of counsel,) for the People:

Even if there were an irregularity in the mode of selecting the jurors, such error would not require a reversal of the judgment of conviction, as no prejudice was shown to result to the defendant from such irregularity. *Siebert* v. *People*, 143 Ill. 571; *Healy* v. *People*, 177 id. 306.

A motion for a separate trial in a criminal case is addressed to the sound legal discretion of the court, and its action in denying the motion is not subject to review unless it appears there was an abuse of that discretion. *Doyle* v. *People*, 147 Ill. 394; *Gillespie* v. *People*, 176 id. 238; *Maton* v. *People*, 15 id. 536; *Johnson* v. *People*, 22 id. 314.

On a trial for murder, declarations of intentions and threats against the deceased are admissible in evidence, not because they give rise to a presumption of law as to guilt, (which they do not,) but because from them, in connection with other circumstances and on proof of the *corpus delicti*, guilt may be logically inferred. *Farris* v.

*People,* 129 Ill. 521; *Painter* v. *People,* 147 id. 444; *Williams* v. *People,* 166 id. 132; Wharton on Crim. Evidence, (9th ed.) sec. 756.

Remarks by the State's attorney, even though improper and censurable, are not ground for reversal where the verdict is justified by the evidence. *Duffin* v. *People,* 107 Ill. 113; *Bradshaw* v. *People,* 153 id. 156; *Bonardo* v. *People,* 182 id. 411.

There should be no reversal for improper remarks of the State's attorney except for a palpable abuse of discretion in this respect, manifestly tending to an improper conviction. *Bulliner* v. *People,* 95 Ill. 394.

There should be no reversal where the evidence of the defendant's guilt is free from a reasonable doubt, aside from the evidence given in exoneration. *Raggio* v. *People,* 135 Ill. 535.

Physical objects which form a part or serve to illustrate the transaction or occurrence which is the subject of judicial investigation may be introduced in evidence and displayed before the jury. *Tudor Iron Works* v. *Weber,* 129 Ill. 535; *Painter* v. *People,* 147 id. 466.

A judgment will not be reversed because of erroneous instructions where it clearly appears the verdict must have been the same had the error not been committed. *Zimm* v. *People,* 111 Ill. 49.

The refusal of proper instructions is not ground for reversal where others stating correctly the same principles are given. *Bland* v. *People,* 3 Scam. 634; *Gannon* v. *People,* 127 Ill. 507; *Huston* v. *People,* 121 id. 497.

The reasonable doubt that will justify and require an acquittal must be as to the guilt of the accused when all the evidence is considered. *Weaver* v. *People,* 136 Ill. 542; *Carlton* v. *People,* 150 id. 181; *Williams* v. *People,* 166 id. 132.

The jury in a criminal case are not bound to believe the testimony of the defendant any further than it may be corroborated by other credible evidence, and there is no impropriety in so instructing them. *Doyle* v. *People,*

147 Ill. 394; *Hirschman* v. *People*, 101 id. 568; *Chambers* v. *People*, 105 id. 409; *Bressler* v. *People*, 117 id. 422; *Sullivan* v. *People*, 114 id. 24.

The court need not repeat the same instruction for both parties. It is enough if the jury has been once instructed on the proposition. *Schintz* v. *People*, 178 Ill. 320.

Where an affidavit of newly discovered evidence discloses nothing but cumulative evidence, and which, if introduced on the trial, could not have changed the result, a motion for a new trial based on it is properly denied. *Bulliner* v. *People*, 95 Ill. 394.

Mr. CHIEF JUSTICE MAGRUDER delivered the opinion of the court:

*First*—It is conceded, that plaintiff in error shot and killed the deceased Charles Jennings with a shot-gun on the morning of June 18, 1900, while Jennings was sitting in a buggy or phaeton with his wife. The theory of the defense is, that the deceased Charles Jennings had a revolver, and fired once at the plaintiff in error, and was about to fire again when plaintiff in error shot him. In other words, it is claimed on the part of plaintiff in error, that he fired the fatal shot, which resulted in the death of Charles Jennings, in self-defense, and to save his own life. The evidence tends to show that the plaintiff in error was a violent and dangerous man, and known as such in the community where he lived. He entertained feelings of hostility towards his sister, and after the occurrence of June 14, 1900, had evidently become angry with his brother-in-law, the deceased Charles Jennings. At the time of the occurrence on Saturday, June 16, in Nebo, the streets appear to have been well filled with people. More than seven witnesses testify that on Saturday afternoon the plaintiff in error ran after the deceased and his wife, while they were passing through one of the streets of Nebo in a vehicle, and in an angry manner called to the deceased to stop, and used abusive

and profane language towards him, and made threats
against him. It is also clearly proven that his own wife
sought to restrain him from any attempt to interfere
with Charles Jennings on Saturday afternoon.

There are circumstances, tending to show that the
occurrence of Monday morning was simply a continua-
tion of the occurrence of Saturday afternoon. There are
circumstances, tending to show that plaintiff in error ex-
pected and prepared for the meeting, which took place
between himself and Charles Jennings on Monday morn-
ing. When Minnie Henry brought the gun to plaintiff
in error, the gun was standing by the safe or cupboard
ready and loaded. There was only one room, upon the
first floor at any rate, in the house, occupied by Charles
Henry, and where the gun was. Charles Henry swears
that the gun belonged to his father, and that he did not
know whether his father brought it there that morning
or not, and did not know where it came from. The tes-
timony of Mrs. Jennings tends to show that plaintiff in
error was in the house when she and her husband ap-
proached from the south, and saw them coming and ran
out of the house to the road and down the road to meet
them. She swears that, when he came down the road,
he picked up a rock and threw it at them, and grabbed
the horses by the bits, walking backwards until they
came within a short distance of the front door of the
house, where Minnie Henry was. According to her testi-
mony, he appeared to be detaining the horses and buggy,
until he should reach a point in front of the house, where
the gun could be easily given to him. She says that he
was between the wheels of the buggy, which had been
turned a little to the left, when he fired the shot-gun, or
very nearly between the wheels. He certainly must have
been very close to Jennings when he fired the gun, be-
cause the proof is uncontradicted that the clothes of the
deceased were burned, and that the shot went through
his body and lodged in the cushion of the buggy in the

rear of him. If Mrs. Jennings is to be believed, Jennings did not fire any revolver before he was shot by the plaintiff in error. She does not deny that her husband may have had a revolver, but says that, if it was fired, it was fired at the same time when the shot-gun was fired, so that there was, as she calls it, "a double shot." That is to say, her testimony is that, if her husband fired a shot, it was fired at the same instant when the shot-gun was fired, and thereby the two shots appeared to be one shot. She also says that she wore a sun-bonnet, her husband was to the right, and she seized the reins in order to prevent the horses running away, and failed to notice whether he fired a revolver or not.

Minnie Henry states that, when she directed the plaintiff in error how to find her husband who was at work in the field, she went back into the house to attend to her household duties, and did not again go to the front door to see what was going on, until she heard a voice, which, she thought, was the voice of plaintiff in error calling her. She, therefore, did not witness what occurred between plaintiff in error and Charles Jennings before they approached near enough to the house to enable Minnie Henry to hear the voice of plaintiff in error. Hence, the statement of Mrs. Jennings, to the effect that plaintiff in error ran down the road and picked up a rock, and threw it at the buggy, and grabbed the horses by the bits, is not contradicted by the testimony of Minnie Henry. That part of the statement made by Mrs. Jennings is in conflict with the testimony of plaintiff in error, but is not in conflict with the testimony of Minnie Henry for the reason stated. It was for the jury to determine whether Mrs. Jennings told the truth, when she said that plaintiff in error first assaulted them with a rock on the roadside, or whether the testimony of plaintiff in error, to the effect that he approached the buggy in a peaceful manner, and put his hand on the wheel, and asked about the occurrence of Thursday, was true or not. If plaintiff in

error commenced the assault in the way stated, and led Jennings and his wife towards the house where his gun was, and by curses and intimidation led them to that point, and there killed Jennings, the act was certainly murder. If plaintiff in error committed the first assault, he had no right to fall back to his gun, and then call for his daughter-in-law to bring the gun, and immediately turn to kill the man whom he first assaulted, and who, according to the testimony of Mrs. Jennings, was pleading with him to listen to reason and to an explanation of the impounding or distraining of the cows. A person is not permitted to bring on an assault, and, when he finds the person assaulted armed and defending himself, then to draw a deadly weapon and kill him. In *Gainey* v. *People*, 97 Ill. 270, it was held that, if the accused seek and bring on a difficulty with the deceased at the time of the killing, he will not be allowed to avail of the right of self-defense, in order to shield himself from the consequences of the killing, however imminent the danger, in which he may have found himself in the progress of the affray, which he brought upon himself.

The testimony of Mrs. Jennings, that only one shot was fired is confirmed by the testimony of three other witnesses, to-wit, Mr. and Mrs. Guthrie, and a man by the name of Voshall. These witnesses were within hearing of the shooting, and all swear that only one shot was fired.

On the contrary, if the testimony of plaintiff in error and of Minnie Henry is true, then the plaintiff in error shot the deceased in self-defense. In considering whether the testimony of these witnesses was true or not, the jury had a right to take into consideration that William Henry and Minnie Henry were both under indictment for murder, and were on trial for that offense. If their testimony is true, the deceased had a revolver, and fired it once at plaintiff in error, and was about to fire it a second time when the deceased received the fatal shot. According

to the testimony of plaintiff in error, he did not make the first assault, and, if his testimony is to be believed, then his defense is made out. Charles Henry was working at some distance in the field, and swears that he heard two shots. He also says he saw a man go behind the buggy, but did not know what man it was, and saw a woman come out of the house, but did not know what woman it was. His testimony amounts to but little, as sustaining the testimony of plaintiff in error and Minnie Henry, because he was too far off to see what actually occurred. The proof shows that the deceased purchased cartridges on Saturday afternoon with a view of defending himself, in case he should be attacked by his brother-in-law. The proof also tends to show that the deceased had a revolver with him in the buggy. But whether or not he fired that revolver once or twice or at all, is a matter about which the evidence is conflicting. In other words, there is, on the one hand, the testimony of Mrs. Jennings giving one account of this transaction, which, if true, justifies the verdict rendered by the jury; and there is, on the other hand, the testimony of the plaintiff in error and Minnie Henry, both under indictment for murder, giving another account of the transaction, which, if true, should lead to a reversal of the judgment rendered by the trial court. In *Gainey* v. *People, supra,* we said (p. 275): "A reversal is asked, first, upon the ground the evidence is insufficient to sustain the verdict. Leaving out of sight the testimony of the accused themselves, it must be conceded that the evidence otherwise fully warranted the conviction. What, if any, credit they were entitled to, was purely a question for the jury, and it having been determined adversely to the accused, this court has no right to interpose by substituting its own opinion for that of the jury. The law, whether wisely or unwisely, entrusted the consideration and decision of that question to the jury, and when it having honestly, according to the best lights before it, performed that duty, its

determination must be accepted as conclusive, unless it is reasonably clear that an error has been committed. *. * * The most important and useful function, which the jury is required to perform, is to determine on which side of a controversy the real truth lies, where the testimony as to the material facts is directly in conflict and irreconcilable, and its conclusion in such case, of necessity, depends largely upon the credit to be given to the opposing witnesses,—hence it is universally admitted to be the peculiar province of the jury to determine the credibility of the witnesses. In capital cases, like the present, the accused, if guilty, has the most powerful and urgent of motives to misrepresent the real facts, and, if this court is bound in every case of the kind to set aside the conviction merely because the testimony of the accused shows a case of justifiable homicide, it would not be long until there would be no security for life or limb, and trials by jury would become idle and useless ceremonies."

In view of this conflict in the testimony, it is well to see what instructions were given by the court in reference to the matters, about which there was such conflict. On behalf of the defendants below, and at their request, the court gave to the jury the following instructions among others:

38. "You are instructed that, if you find from the evidence that the defendant and Jennings met in the public road and engaged in conversation, and, while so engaged, the deceased Charles Jennings drew a revolver and fired at the defendant without provocation, and if you further find that the circumstances, with which the defendant was then surrounded, were such as to induce in the defendant a reasonable and well grounded belief that he was in danger of losing his life, or receiving great bodily harm, then, if you find the facts as last herein stated, the law is, that the defendant would be justified in defending himself, whether the danger was real or only apparent.

39. "You are instructed that, if you find from the evidence in this case that the deceased, Charles Jennings, without provocation, assaulted William Henry, the defendant, in such a manner as to induce in the said William Henry a reasonable and well grounded belief that he was actually in danger of losing his life, or receiving great bodily harm, and that said William Henry, acting upon such reasonable belief, shot and killed said Charles Jennings, then, if you find the facts as last herein stated, you must find the defendant not guilty.

40. "The court instructs you that if you find from the evidence that on June 18, 1900, the defendant, William Henry, met the deceased, Charles Jennings, and his wife in a buggy in the public road at the time alleged by the witnesses, and if you further find from the evidence that the defendant, William Henry, was conducting himself in a quiet, peaceable and orderly manner, and, while the said William Henry was thus conducting himself in an orderly manner, the deceased, Charles Jennings, without provocation drew a revolver and pointed it at the said Henry, and if you further find that the defendant, Henry, then honestly believed that he was in danger of losing his own life, or receiving great bodily harm, and if you further find from the evidence that said William Henry had reasonable grounds to believe that his life was in danger, and that he, acting upon such belief and moved by such fear, obtained a gun and then honestly thought it was necessary to shoot said Jennings in order to save his own life or prevent receiving great bodily harm, and if you find that, under the influence of such belief, he did shoot and kill said Jennings, then, if you find the facts as last above stated, you must find a verdict of not guilty."

In addition to these instructions, the court below gave the following instruction upon his own motion:

"Before the jury can convict the defendants, or either of them, of murder, they must be satisfied beyond a reasonable doubt, that the defendant, William Henry, in-

tended to murder Charles Jennings, that he had this intent at the time of firing, and that he fired with no other intent, and without any reasonable apprehension of receiving from said Charles Jennings great bodily harm. If, after considering all the evidence, you entertain any reasonable doubt as to whether the said William Henry at the time of the shooting was under reasonable apprehension, that the said Charles Jennings intended to kill him, or to inflict upon him great bodily harm, and that he fired the shot in self-defense, then the jury must acquit."

In connection with these instructions the court also gave, in behalf of defendants below, and at their request, the following instructions:

21. "You are instructed that the jury have no right to disregard the testimony of the defendants through mere caprice, or on the ground alone that they are the defendants, and stand charged with the commission of a crime. The law presumes the defendants to be innocent, and it is your duty to act upon such presumption while considering their evidence, together with all the other evidence, and it is the duty of the jury to fairly and impartially consider their testimony together with all the other testimony in the case.

22. "The court instructs the jury that, as a matter of law, the defendants are competent witnesses to testify in their own behalf, and, when they do so testify, they at once become the same as any other witness, and their credibility is to be tested by and subjected to the same tests as are legally applied to any other witness, and, in determining the degree of credibility that shall be accorded to their testimony, the jury have a right to take into consideration their demeanor and conduct on the witness stand, as well as the reasonableness or unreasonableness of the story told by them, together with all the facts and circumstances in the case, and shall give their testimony such weight as the same is entitled to."

It thus appears that the court, by its instructions, fairly presented to the jury the question, whether or not the theory of defense, set up by the plaintiff in error, was true and correct or not. Evidently the jury believed the testimony of Alice Jennings, and did not believe the testimony of plaintiff in error and Minnie Henry. After a careful consideration of all the evidence, we are not able to say that the jury were influenced by prejudice or passion in crediting the testimony of Mrs. Jennings, rather than that of the defendants below.

*Second*—The question remains whether or not any errors of law were committed by the court below, which would justify this court in disturbing the judgment here sought to be reversed. As was said in *Gainey* v. *People, supra,* the determination of the jury "must be accepted as conclusive, unless it is reasonably clear that an error has been committed."

1. The first error is alleged to have been the refusal of the trial court to grant a motion, made by the plaintiff in error to quash the special panel of jurymen. A special venire of one hundred jurymen was ordered. Later, a venire for a regular panel of thirty was ordered to be drawn for the third and fourth weeks of the term, being the second regular panel for the term. There were found to be but twenty-two names in the box, two of whom were non-residents, and two of whom did not report. Eighteen were reported. The defense challenged the array, and moved to quash the regular panel, which motion was sustained, and the regular panel was quashed. It is claimed by the plaintiff in error that, when the regular panel was quashed, the court was not legally constituted in contemplation of law for the trial of criminal cases. It is not claimed that the special panel was not legally drawn, nor is it insisted that plaintiff in error was in any manner prejudiced by the overruling of the motion to quash the special panel. The record shows that a special venire was afterward issued, as provided by sec-

tion 13 of chapter 78 of the Revised Statutes, entitled "Jurors;" and the plaintiff in error was not compelled to exhaust his peremptory challenges before the jury was selected.   He was not in any manner prejudiced because there was no regular panel, which had been quashed upon his own motion.   A strict interpretation of the statute does not require that the court have a regular panel in attendance while a jury is being selected from a special panel, which has been drawn in accordance with the provisions of the statute.   Even if there was an irregularity in the mode of selecting the jurors, such error would not require a reversal of the judgment of conviction, as no prejudice was shown to result to plaintiff in error from such irregularity.   (*Siebert* v. *People,* 143 Ill. 571; *Healy* v. *People,* 177 id. 306.)

2. It is next urged that the court erred in refusing to grant a severance, and give the plaintiff in error a separate trial, instead of a joint trial with Minnie Henry. The only reason assigned, why plaintiff in error should have had a separate trial, is that he would thereby have had the benefit of the testimony of the witness, Charles Henry, untrammeled by the fact that Charles Henry was the husband of the co-defendant, Minnie Henry.   The record shows, however, that the court allowed Charles Henry to testify; and the People made no objection to the fact that he was allowed to testify, and consented that his testimony should be given and controlled by instructions.   The plaintiff in error had all the benefit of the testimony of Charles Henry, which he could have had, had he been placed on trial alone.   It is difficult, therefore, to see how plaintiff in error was prejudiced by the action of the court in this respect.   Moreover, a motion for a separate trial in a criminal case is addressed to the sound discretion of the court, and its action in denying the motion is not subject to review, unless it appears that there was an abuse of that discretion.   (*Doyle* v. *People,* 147 Ill. 394; *Gillespie* v. *People,* 176 id. 238; *Spies*

v. *People*, 122 id. 1).   Here, there was no abuse of judicial discretion, in view of the fact that the court allowed Charles Henry to testify, and the People made no objection thereto.

3.  It is furthermore contended by the plaintiff in error that the trial court erred in allowing testimony to be introduced in regard to the conduct of the plaintiff in error on Saturday, June 16.   The proof as to the occurrence on Saturday, June 16, showed that the plaintiff in error made threats against the deceased Charles Jennings because he had taken up the cattle of Charles Henry while they were trespassing upon the deceased's premises.   It was proper to prove what occurred in Nebo on the Saturday in question for the purpose of showing the *animus* of the plaintiff in error towards the deceased.   "Declarations of intention and threats are admissible in evidence, not because they give rise to a presumption of law as to guilt, which they do not, but because from them, in connection with other circumstances, and on proof of the *corpus delicti*, guilt may be logically inferred.   Evidence of this kind, for this purpose, is always competent." (*Painter* v. *People*, 147 Ill. 444; *Farris* v. *People*, 129 id. 521; *Williams* v. *People*, 166 id. 132; *Carlton* v. *People*, 150 id. 181; Wharton on Crim. Ev.—9th ed.—sec. 756; *Lyons* v. *People*, 137 Ill. 602; *Wilson* v. *People*, 94 id. 299).

Plaintiff in error insists that proof of what occurred on Saturday in Nebo was proof of a distinct, independent and substantive offense.   We do not think that the Nebo affair was "a distinct, independent and substantive offense," as contemplated by the law.   The proof, when closely examined, shows that the same thought that was in the mind of plaintiff in error in Nebo on Saturday concerning the action of the deceased in reference to the cows of Charles Henry was in the mind of plaintiff in error when he met Jennings and his wife on Monday.   Hence, it was proper to show everything that occurred in Nebo on Saturday, in order to show the intent or con-

dition of mind of the defendant. The most, that can be said of the conduct of the plaintiff in error on the previous Saturday, is that, in connection with his threats and abusive language, he appeared to be guilty of an attempted assault upon Charles Jennings. But one criminal act may be shown as evidence of another, where such a connection between them exists in the mind of the actor, as links them together for some purpose, which he intended to accomplish. (*Shaffner* v. *Commonwealth*, 72 Pa. St. 65; *Farris* v. *People, supra*). In *Farris* v. *People, supra*, we said: "When facts and circumstances amount to proof of another crime than that charged, and there is ground to believe that the crime charged grew out of it or was in any way caused by it, such facts and circumstances may be proved, to show the *quo animo* of the accused." We are of the opinion for this reason that there was no error in allowing testimony to be introduced of the occurrence which took place on Saturday.

4. Complaint is made of remarks made by the State's attorney during the argument of the case. These remarks had reference to the absence of the revolver claimed to have been used by the deceased, and which was not produced by either side upon the trial. In the course of the trial, each side charged the other with withholding the revolver, and failing to produce it for the examination of the jury. The State charged that, when the plaintiff in error shot Charles Jennings, the revolver, if he had one, must have fallen out of his hand into the roadway, and that it was picked up by the plaintiff in error after the horses ran away toward the north and carried Mrs. Jennings and her dying husband up to the farm of the Guthries. On the other hand, counsel for plaintiff in error made certain remarks, and asked certain questions, calculated to convey the impression to the jury that Mrs. Jennings had disposed of the revolver by throwing it into a well upon the Guthrie place. There was really no evidence to show that either side was guilty of with-

holding the revolver, but the remarks made in reference to it were inferences drawn by counsel from the circumstances, developed by the proof as to its disappearance. There is nothing to show that the minds of the jurymen were prejudiced in any way by these bickerings between counsel. The jury were told in instructions, given in behalf of the defendant, that it was their duty to decide the case wholly upon the evidence and nothing else, and, if either counsel had made any statement which was not justified by or did not grow out of the evidence, it would be their duty to disregard such statement. "The trial judge should always see that the line of argument is kept within reasonable bounds, and not allow the defendant to be convicted or prejudiced on account of real or imaginary crimes for which he is not upon trial. And, unless for a palpable abuse of discretion in this regard, manifestly tending to an improper conviction, there should be no reversal." (*Bulliner* v. *People*, 95.Ill. 394). We discover no abuse of discretion in this respect in the present record. We said in *Spahn* v. *People*, 137 Ill. 538: "Some reliance must be placed upon the common sense and discrimination of the jury, where counsel seek to draw improper inferences from the evidence. While arguments of that character are not to be approved or looked upon with favor, still they will not ordinarily be deemed sufficient to necessitate a reversal of the judgment, unless they are of such a character as to raise an inference that the jury were probably misled or improperly influenced thereby." We do not think that such was the case here.

5. Complaint is also made that the court permitted the buggy or phaeton, in which the deceased was riding when he was shot, to be produced in court and exhibited to the jury, together with the impression made upon the cushion of such vehicle by the shot which passed through the body of the deceased. The clothes, worn by the deceased at the time, were also brought into court. The presence of the phaeton enabled the witness to explain

to the jury the position of the deceased at the time he
received the wound, and the position of the plaintiff in
error at the time he fired the shot, as well as the range
of the shot fired, which went through the body of the de-
ceased, and lodged in the back cushion of the phaeton.
The clothes showed also that they had been burned,
which tended to prove the nearness of the position of
plaintiff in error to that of the deceased when the shot
was fired.    This court has held that physical objects,
which form a part of, or serve to illustrate, the transac-
tion or occurrence, which is the subject of judicial inves-
tigation, may be displayed before the jury, and formally
introduced in evidence.    (*Painter* v. *People*, 147 Ill. 444;
*Tudor Iron Works* v. *Weber*, 129 id. 535).

6. The next subject of complaint, urged upon our at-
tention by counsel for plaintiff in error, relates to instruc-
tions given and refused by the trial court.    Instruction
numbered 4, given for the People, is complained of, be-
cause it defines the crime of murder, whereas the jury had
a right to find the defendants guilty of manslaughter, if in
their opinion the evidence reduced the offense to the grade
of manslaughter.  Undoubtedly, under the indictment for
murder, the jury could render a verdict of manslaughter,
and they were fully instructed, in the instructions which
were given, as to the proper definition of manslaughter.
The jury were also told, in instruction numbered 23 given
for the People, that "under the indictment in this case,
which is for murder, the jury may find the defendants
guilty of manslaughter if they are not satisfied beyond a
reasonable doubt that the defendants, or either of them,
are guilty of the crime of murder, and are satisfied be-
yond a reasonable doubt, that they are guilty of man-
slaughter as defined in these instructions." The fact, that
the instruction complained of, was limited to a definition
of murder without saying anything about manslaughter,
did not prevent the jury from finding the defendant guilty
of manslaughter alone, if such had been their conclusion

from the evidence, in view of the other instructions given upon the subject. The instruction in question is also objected to, because it required the jury to find, among other things, that the killing was not done in self-defense. The contention is that the instruction ignores the law of apparent self-defense, and limits self-defense to actual self-defense. We do not think that the instruction complained of can bear any such construction. The law does not make a distinction between actual and apparent self-defense, but between danger which is real, and danger which is apparent. A number of instructions were given, which told the jury that, if plaintiff in error was assaulted in such a manner as to induce in him a reasonable belief that he was in danger of losing his life, or suffering great bodily harm, he would be justified in defending himself, and taking the life of his assailant if necessary, although the danger was not real, but only apparent. The fact, that the instruction complained of used the word "self-defense" without drawing the attention of the jury to self-defense in view of an apparent instead of a real danger, worked no harm or prejudice to the plaintiff in error. By the instruction in question the jury were not instructed to find the defendants below guilty of murder, but were only told what the law pronounced murder, and, therefore, the instruction is not subject to the criticism, passed by this court in several cases upon instructions which ended thus: "and you should find him guilty of murder." (*Panton* v. *People*, 114 Ill. 505; *Lynn* v. *People*, 170 id. 527; *Steiner* v. *People*, 187 id. 244). On a trial for murder it is not error to give an instruction, embodying the statutory definition of the crime, and stating in the language of the statute when and under what circumstances malice will be implied. (*Alexander* v. *People*, 96 Ill. 96; *Crowell* v. *People*, 190 id. 508; *Wallace* v. *People*, 159 id. 446).

Complaint is also made of an instruction given for the People, which referred to the taking of the life of another by shooting him with the deliberate intention of

killing him without just cause or provocation. It is said that this instruction was calculated to induce the jury to conclude that, although plaintiff in error had been attacked by Jennings, yet at the instant the shot was fired there was not positive real danger or absolute necessity for firing such shot. The instruction is not justly subject to the criticism made upon it. Where one is acting in self-defense, either from real or apparent danger, the killing is not without just cause, because self-defense in law is just cause. The instructions should be read as one charge. And it is sufficient if the series of instructions, considered as a whole, fully and fairly announce the matters of law applicable to the theory of the prosecution and defense. (*Lilly* v. *People*, 148 Ill. 467; *Crowell* v. *People, supra*). The instruction complained of, when taken in connection with instructions 37, 39 and 40 given for the defense, correctly states the law, and could not have misled the jury. Instructions 39 and 40 have already been set forth. Instruction 37 told the jury "that, in the determination of the question in this case as to whether there was or was not sufficient provocation, and as to whether the circumstances show an abandoned and malignant heart, it is your duty to take into consideration all the facts and circumstances, as shown by the evidence, for the purpose of determining the question as to whether the defendant was or was not actuated from motives of protecting his own life, or his body from serious injury." By instruction 37½ the jury were also told "that the law presumes malice from the unlawful and deliberate use of a dangerous and deadly weapon, but the law is, also, that the law does not presume malice from the deliberate use of a dangerous and deadly weapon, when used in necessary or apparent necessary self-defense."

Counsel for plaintiff in error make this complaint against two instructions read together: that they merely require the killing to be satisfactorily shown beyond all reasonable doubt without requiring such showing to be

from the evidence. The criticism is without force, when the second of the instructions in question is read as a whole. Counsel quote this part of the instruction: "If the killing of the person mentioned in the indictment be satisfactorily shown beyond all reasonable doubt to have been the act of the defendant, then the law pronounces it murder," but the instruction proceeds as follows, using words which counsel have omitted or overlooked: "unless the defendants have shown or it appears by the evidence for the People that circumstances existed excusing or justifying the act or mitigating it, so as to make it manslaughter." When the latter part of the instruction is read in connection with the former part, the objection made to it disappears. Moreover, the jury were told in instruction numbered 32, given for the defendants, "that the statute declares that, when the killing is proven, the burden of proof is cast on the defendant to prove circumstances of mitigation, or that justify or excuse the homicide, unless such proof arises out of the evidence for the People. This provision of the statute does not require the defendant, when he assumes the burden of proof, to satisfactorily establish such defense. But, although the killing may have been proven, and the defendant has the burden of proof cast upon him to prove circumstances of mitigation, or that justify or excuse, the burden is still on the People to prove the guilt of the defendants. And, unless the People have established by competent evidence, to the exclusion of every reasonable doubt, guilt, in manner and form as charged in the indictment, it is your duty under your oaths, to find the defendant not guilty."

Another instruction is objected to, because in it the jury were told that the reasonable doubt they were permitted to entertain must be as to the guilt of the accused on the whole of the evidence, and not as to any particular fact in the case. This instruction is in accordance with the rule announced by this court in a number of cases. In *Weaver* v. *People*, 132 Ill. 536, we said (p. 542):

193—13

"The rule is so well settled by repeated decisions, that the reasonable doubt that will justify and require an acquittal must be as to the guilt of the accused when the whole of the evidence is considered, that citation of cases is unnecessary." (See also *Carlton* v. *People*, 150 Ill. 181; *Williams* v. *People*, 166 id. 132). Moreover, the court gave three other instructions in behalf of the People, and two in behalf of the defendants, upon the subject of reasonable doubt which, when read in connection with the instruction complained of, could not have failed to enable the jury to properly understand the law, as it has been laid down in numerous decisions of this court upon the question of reasonable doubt.

Complaint is also made of an instruction, given for the People, which reads as follows:

"The court instructs the jury that, although the defendants have a right to be sworn, and to give testimony in their behalf, the jury are not bound to believe their testimony, but they are bound to give it such weight as they believe it is entitled to; and their credibility and the weight to be attached to their testimony are matters exclusively for the jury, and the defendants' interest in the result of the trial is a matter proper to be taken into consideration by the jury in determining what weight ought to be given to their testimony."

The instruction thus complained of is a literal copy of instruction numbered 6, set forth in *Bressler* v. *People*, 117 Ill. 422, and there approved by this court. In *Hirschman* v. *People*, 101 Ill. 568, this court said (p. 576): "The jury were not bound to believe the evidence of the defendant any further than it may have been corroborated by other credible evidence, (*Gainey* v. *People*, 97 Ill. 270,) and we perceive no impropriety in saying so to them. The instruction, in substance, is sustained by *Crabtree* v. *Hagenbaugh*, 25 Ill. 233; *Yundt* v. *Hartrunft*, 41 id. 9; *Miller* v. *People*, 39 id. 457." (See also *Bulliner* v. *People*, 95 Ill. 394; *Chambers* v. *People*, 105 id. 409). The instruction com-

plained of must be read in connection with instructions, numbered 21 and 22 given for the defendants, which have already been hereinbefore set forth. In the latter instructions the jury were told that it was their duty to consider the testimony of the defendants fairly and impartially, and that it should be tested by, and subjected to, the same tests as were applied to the testimony of other witnesses. When all the instructions, given on the subject of the testimony of the defendants by the People and by the defendants, are read together, the objections made by counsel are overcome. (See also *Doyle* v. *People*, 147 Ill. 394; *Siebert* v. *People*, 143 id. 571).

Another instruction given for the People is complained of, which reads as follows:

"The jury are further instructed that, if they believe from the evidence beyond a reasonable doubt that the defendant, William Henry, brought on the difficulty between the deceased, Charles Jennings, and himself, at the time of the killing, and that the defendant was the first assailant, he cannot avail himself of the right of self-defense, in order to shield himself from the consequences of the killing of Charles Jennings, if such is the proof, however imminent the danger, in which he may have found himself in the progress of the affray which he so brought on himself; unless you further believe that the defendant, in good faith endeavored to decline any further struggle before the mortal shot was fired."

This instruction is objected to by counsel for plaintiff in error, upon the alleged ground that it assumes that there was a difficulty, and that there was an affray. There must have been a difficulty and an affray, or the killing would not have taken place. The evidence clearly shows that there was a difficulty. The instruction complained of is similar to an instruction, given in the case of *Gainey* v. *People*, 97 Ill. 270, and uses almost the same language as the instruction given in the latter case. The same objections, which are here made to the instruction, were

also made in the *Gainey case*, and were there held to be untenable.

Another instruction given for the People is complained of which reads as follows:

"You are further instructed that although you may believe from the evidence that the deceased, Charles Jennings, was armed with a revolver at the time of the killing, and that he made the first attack upon the defendant, William Henry, yet, if you further believe from the evidence beyond a reasonable doubt, that at the time the mortal shot was fired by defendant, William Henry, it was not necessary, or apparently necessary, in order to save his own life or to prevent his receiving great bodily harm, then the killing would not be justifiable under the plea of self-defense interposed in this case."

One of the questions in issue upon the trial was, whether Jennings was the assailant and made an attack upon the plaintiff in error, or not. Instructions 38 and 40, asked by the defendants below and given for them, were based upon the same disputed facts as the instruction here complained of. We fail to see that the instruction is erroneous.

An instruction was also given for the People in the following words:

"The jury are instructed that, before the defendant, William Henry, can avail himself of the right of self-defense, it must appear that, at the time of the killing, the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the deceased, Charles Jennings, was absolutely necessary, or apparently necessary, and it must also appear that the deceased, Charles Jennings, was the first assailant, or that the defendant, William Henry, had in good faith endeavored to decline any further struggle before the mortal shot was fired."

The jury could not have been misled by this instruction, which is substantially in the language of the

statute, when the instruction is considered in connection with other instructions bearing upon the same subject, and when the whole series of instructions is considered together. It is justified by the decision in the case of *Gainey* v. *People, supra.*

Instruction, numbered 17 given for the People, could not have misled the jury for the same reasons referred to above in connection with the last two instructions herein quoted. (*Roach* v. *People,* 77 Ill. 25).

Instruction numbered 18 given for the People, which stated to the jury when and under what circumstances the killing would amount to manslaughter, is complained of by the plaintiff in error, mainly upon the ground that the instruction uses these words at the beginning thereof: "If you believe from the evidence beyond a reasonable doubt that the defendant, William Henry, sought for and provoked the difficulty with the said Charles Jennings on the 18th day of June, A. D. 1900," etc. Counsel say there is no evidence in the record, tending to show plaintiff in error sought for and provoked a difficulty with the deceased. We think that the evidence, given by Mrs. Jennings, tended to show that the plaintiff in error did seek for and provoke such difficulty. It was for the jury to determine whether she told the truth or not.

In this case the court gave to the jury twenty-four instructions, asked by the People, and forty-four instructions, asked by defendants below, beside two instructions given by the court upon its own motion. After a careful examination of all these instructions, we are of the opinion that, when considered as a series, they fairly presented the law, and that no substantial error has been pointed out by counsel for plaintiff in error. In determining the propriety of giving an instruction, it must be considered in connection with other instructions upon the same subject, and if the law has been fairly presented, this court will not reverse because the instruction objected to does not contain all the law on the subject,

unless the peculiar circumstances of the case render the instruction misleading. (*McCoy* v. *People*, 175 Ill. 224; *Gilman* v. *People*, 178 id. 19; *Little* v. *People*, 157 id. 153; *Lilly* v. *People*, 148 id. 467). The refusal of proper instructions is not ground for a reversal, where others, stating correctly the same principles, are given. (*Bland* v. *People*, 3 Scam. 364; *Huston* v. *People*, 121 Ill. 497; *Gannon* v. *People*, 127 id. 507).

Counsel for plaintiff in error complain of the refusal of the court to give some thirteen instructions, asked for the defendants below, which were refused. After a careful examination of the refused instructions, and comparing them with the instructions given for both sides, we are satisfied that all that was material in the refused instructions was embodied in the instructions which were given. The court need not repeat the same instruction for both parties; it is enough if the jury has been once instructed upon the proposition. (*Schintz* v. *People*, 178 Ill. 320).

Counsel for plaintiff in error also complain that the court refused one or two instructions, asked by the defendants below, which limited the attention of the jury to the words used by plaintiff in error, William Henry, on Saturday, the 16th of June, and instructed them to determine whether such words amounted to a threat or intention then deliberately formed to kill the deceased. The refusal of these instructions was not improper, inasmuch as the evidence as to the occurrence of Saturday was admitted to show the *animus* of plaintiff in error at the time towards the deceased, and also that he made an attempt at that time to assault the deceased. The law does not require that the court instruct the jury upon every question as to why evidence is admitted, or as to the purpose for which evidence is admitted. If this were allowed, instructions would reach an interminable length.

7. It is furthermore claimed by the plaintiff in error that the trial court erred in refusing to grant a new trial.

The plaintiff in error produced affidavits by two parties, that they had found in the roadway somewhere near the place, where the killing occurred on the 18th of June, a revolver. Nothing appears to have been known by the State or by the defense about this revolver, until after the trial of the cause and the rendition of the verdict therein. A new trial was asked in order that, upon the second trial, the defense might introduce the revolver so found. It is not perceived how the result would have been different, or how the evidence upon the trial would be any different, if such a revolver were produced, assuming that it was truly the revolver used at the time of the killing. There was testimony to the effect that a revolver was in the possession of the deceased, Charles Jennings, and that it was fired at the time of the difficulty between him and the plaintiff in error. No different view of the question could be presented to the jury upon the production of the revolver from that which was presented to them upon the former trial. If the revolver were introduced upon a second trial, it would merely amount to newly discovered evidence, cumulative in its character. A new trial will not be granted on the ground of newly discovered evidence, where it is simply cumulative and inconclusive. Nor will a new trial be granted on the ground of newly discovered evidence which is not decisive, or where there has been a want of proper diligence to procure the evidence on the trial. Where an affidavit of newly discovered evidence discloses nothing but cumulative evidence and evidence which, if introduced on the trial, could not change the result, a motion for new trial based upon it is properly denied. The newly discovered evidence on a motion for new trial must be clearly conclusive in its character to require the court to grant a new trial. (*Bulliner* v. *People, supra; Dyer* v. *People*, 84 Ill. 624; *Williams* v. *People*, 164 id. 481; *Bean* v. *People*, 124 id. 576; *Spahn* v. *People*, 137 id. 538; *Adams* v. *People*, 47 id. 376; *Sahlinger* v. *People*, 102 id. 241; *Kinney* v. *People*, 108

id. 519; *Feinberg* v. *People*, 174 id. 609). Upon none of the grounds thus stated, which would justify the granting of a new trial upon the discovery of new evidence, was the plaintiff in error entitled to have his motion for a new trial granted.

After a careful examination of the whole record, we discover no sufficient ground for disturbing the judgment of the court below. Accordingly, the judgment of the circuit court of Pike county is affirmed.

*Judgment affirmed.*