DANIEL D. C. KIPLEY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed April 17, 1905—Rehearing denied June 7, 1905.*

1. MURDER—*rule as to proving that killing was in self-defense.* Under the statute, the killing being proved, the burden of proving circumstances of mitigation that justify or excuse the homicide devolves upon the accused, unless the proof on the part of the People sufficiently manifests that the killing amounts to manslaughter or that accused was justified or excused in committing the homicide.

2. SAME—*when evidence of indictment of deceased is not admissible.* On the trial of an ex-police officer for murder, an indictment returned against the deceased, and the proceedings thereunder for his apprehension, are properly denied admission, where the killing was not done in any attempt to arrest the deceased and the accused is permitted to state fully his knowledge of the deceased's alleged bad character.

3. SAME—*an instruction in language of sections 148 and 149 of the Criminal Code is proper.* An instruction in the language of section 149 of the Criminal Code, relating to the doctrine of self-defense, is erroneous in ignoring the element of apparent danger; but an instruction in the language of sections 148 and 149 together, properly defines the doctrine of self-defense.

4. SAME—*jury may consider all circumstances in determining whether killing was in self-defense.* An instruction in a murder trial is proper which tells the jury that they shall take into consideration all the facts and circumstances surrounding the parties in determining whether or not the killing was in self-defense.

5. SAME—*when instruction in murder trial is not fatally erroneous.* Giving an instruction authorizing the jury to find defendant guilty if they believe the evidence shows that the deceased met his death "by criminal means in manner and form as charged in the indictment" and that the accused is the person who used such criminal means, is not reversible error upon the ground the instruction does not clearly present the doctrine of self-defense, where the other instructions fully state the doctrine of self-defense in clear and positive terms and the jury are instructed to consider all of the instructions as one series.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

The plaintiff in error, Daniel D. C. Kipley, was indicted at the April term, 1902, of the criminal court of Cook county, on the charge of murdering one Joseph J. Hopkins. Upon a trial before the court and a jury at the June term he was found guilty of manslaughter, and his punishment fixed at imprisonment in the penitentiary. A writ of error to the criminal court of Cook county was sued out to reverse this judgment of conviction.

The principal facts in the case are as follows: Plaintiff in error had been a police officer and detective on the Chicago police department for about seven years. During the two years prior to the homicide he had been employed at various times by a private detective agency and also as a detective by a railroad company. For several years prior to the shooting he had been living in flat 11, Ludgate building, Nos. 1841 and 1843 Wabash avenue, in Chicago, unmarried, with a woman named Lilly Arlington, commonly known as "Diamond Lill." The deceased, Hopkins, at the time of his death and for a year and a half prior thereto, had lived at Palos Park, a suburb of Chicago, and was married to a woman mentioned in the testimony as "Blonde Marie." On the night of March 19, 1902, shortly before midnight, the plaintiff in error entered Ike Bloom's saloon, on the north side of Twenty-second street, between State street and Wabash avenue. Hopkins, the deceased, was standing at the bar and was introduced to plaintiff in error by the bar-tender. Kipley replied that he knew Hopkins by several different names. During the conversation Lilly Arlington, who had an appointment to meet Kipley at the saloon at twelve o'clock at night, entered and was introduced to Hopkins by Kipley. The three then entered the dance hall in the rear of the saloon and sat down at a table and ordered some drinks. Kipley then got up and left the saloon, leaving the key to the flat for Lilly Arlington with the waiter. Lilly Arlington and Hopkins remained for a short time at the table, when they arose and went to the bar, where the woman got the key from

the waiter. She then left the saloon and went to another saloon on State street, where she remained for some time and then went to her apartments and went to bed. Kipley, after leaving Bloom's saloon, went to another saloon on State street and remained there for some·time, and upon leaving this saloon met Hopkins on the corner, who inquired where Lilly Arlington was. There was some further conversation between them, and Kipley asked Hopkins for his revolver, and Hopkins gave it to him. They then visited McGuire's saloon and then went back to Bloom's saloon, and Kipley gave the revolver back to Hopkins. There was then some talk between them about getting money, and Kipley said, "Give me that revolver and I will get some money." Hopkins gave him the revolver, and Kipley left the saloon and did not again see Hopkins until the next morning.

Between eight and nine o'clock on the next morning, March 20, Lilly Arlington testified that she was awakened from her sleep in her apartments by Hopkins standing over her with a dagger in his hand. She threw up her hand to protect herself and was struck by the dagger in the hand. Hopkins demanded to know where Kipley was, and ordered her to get up and dress. She got up and was in the act of dressing when there was a knock at the door, and Hopkins opened it and found Kipley on the outside. According to Kipley's story, Hopkins, immediately on seeing Kipley, jumped at him with a dagger in his hand and struck him with it on the left hand, and demanded, with an oath, his revolver. Kipley drew the revolver from one pocket and the cartridges from another and placed them in the revolver and handed it to Hopkins, who placed it in his right overcoat pocket, the handle protruding. Kipley then closed the door and asked Hopkins if he would be quiet if they would send for some beer. The beer was sent for, and the three sat around the table drinking. During this time Hopkins held the knife underneath the table in his hand. It is insisted that during the time Hopkins and Kipley were together on the previous night

and while they were together on the morning of the shooting
Hopkins was abusing and vilifying police officers and. threat-
ened to kill Kipley and Lilly Arlington.   During the time
the beer was being drunk, Hopkins, according to Kipley's
story, continued to get more angry and continued to threaten
to kill Kipley.   Kipley finally got close enough to Hopkins
to draw the revolver from his overcoat pocket, and then,
springing back, told Hopkins to get out of the flat.   Hopkins
jumped from the table on which he was sitting, and Kipley
claims that Hopkins sprang at him (Kipley) with the dagger
uplifted in his hand.   Kipley avoided the assault, and Hop-
kins chased Kipley around the table with the knife upheld to
strike, and on the second circuit of the table Hopkins tipped
the table over on to the lounge, thus blocking Kipley's re-
treat.   Kipley then fired two shots in rapid succession.   One
bullet entered the wall, and the second struck Hopkins at a
point two and one-half to three and one-half inches below
the right arm-pit, and he fell to the floor.

At the time of the shooting there were only three persons
present,—Lilly Arlington, Kipley and Hopkins.   Mrs. Mc-
Chesney, who lived in the same building, was out in the
hall, as was also Chester Carlson, who was in charge of the
elevator.   Mrs. McChesney testifies that on the morning of
March 20, 1902, about twenty-five minutes before nine
o'clock, a gentleman rang her door-bell and asked her if she
would tell him where Kipley's flat was.   The man was Hop-
kins, and he went to Diamond Lill's flat and rapped at the door.
Mrs. McChesney did not wait to see whether the door was
opened, but entered her own flat.   About ten or fifteen min-
utes afterward she was attracted to the hall by the barking
of a dog and went out to see what was the matter.   She saw
Diamond Lill in the hallway and a small boy carrying a can
of beer, going towards her flat.   The boy gave the beer to
Diamond Lill and Mrs. McChesney then returned to her own
apartment.   She afterwards heard another noise in the hall
and again went out.   At this time it was about nine o'clock,

and Diamond Lill was out in the hall holding her hands to her head and screaming: "Danny, you did it! you did it! you did it! Get the police! Get the police! Danny done it!" She kept this up for five or ten minutes and then went to the elevator boy and told him something about getting the police. In the meantime Kipley came out of the flat with a revolver in his hand, which he held above his head, and said: "This is what I did it with; I did it with his own gun; I killed him, God damn son of a bitch; get the police; I give myself up." Thereupon Mrs. McChesney went inside her door while Kipley passed and went and spoke to the elevator boy. Kipley returned past the door, and then Mrs. McChesney went down the hall again, close to the door of flat 11, nearer Diamond Lill's apartments than her own. At that time Diamond Lill ran up to Kipley and said: "Danny, don't shoot! don't shoot any more!" Kipley called her a "God damned rip," and threatened to shoot her if she did not go on, to which she replied that she did not care if he did. Then Kipley started to walk into his flat with the gun in his hand, pointed ahead of him, at the same time calling out to Hopkins: "Shake—shake like a dog; if you move I will blow the top of your head off; I will plug you for luck." Just after he entered the flat Kipley fired a third shot at Hopkins, who lay prostrate on the floor. The police were then called, and when they came they found Hopkins lying in the door between the kitchen and the dining room. The room was in considerable disorder. Out of Hopkin's upper right-hand vest pocket officer Coons pulled a small pearl-handled knife or dagger, about the size of a small letter-opener, with a scabbard and guard over the top, the scabbard end up. After Kipley had been arrested he was taken to the hospital where Hopkins was, and officer Bush asked Hopkins, "Is this the man that shot you?" Hopkins replied, "Yes, you done me a cowardly act." Kipley said, "Didn't you cut me, Joe, and didn't I shoot you with your own gun?" Hopkins answered, "No; you done me dirt; you done me a dirty

trick,—a cowardly trick." Hopkins then said that the revolver was his but that the dagger did not belong to him.

Dr. J. C. Hollister, a physician and surgeon in connection with St. Luke's Hospital, testified that Hopkins was shot posterior to the axillary line, from two and a half to three and a half inches down from the point of the axilla or from the pit of the arm.

JACOB J. KERN, and JOHN A. BROWN, (RICHARD W. MORRISON, of counsel,) for plaintiff in error.

W. H. STEAD, Attorney General, and GEORGE B. GILLESPIE, (JOHN J. HEALY, State's Attorney, and HARRY OLSON, of counsel,) for the People.

Mr. JUSTICE WILKIN delivered the opinion of the court:

It is insisted by the plaintiff in error that the verdict is manifestly against the weight of the evidence; that there were but two witnesses to the homicide; that the testimony of both establishes a clear case of self-defense, and this testimony was not met by any evidence introduced by the People. In the statement of the case we have set out the principal evidence contained in the record, and in order to determine whether the verdict is supported by the evidence it will be necessary to review some of these most important facts and thus endeavor to ascertain the truth of the story.

Section 155 of chapter 38 of Hurd's Statutes of 1903 provides: "The killing being proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." There can be no question but what the shooting was done by the plaintiff in error and that the death of Hopkins was the

result of the shot. This being true, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve upon the accused, unless it can be said that the proof on the part of the prosecution sufficiently manifests that the crime committed amounted only to manslaughter or that the accused was justified or excused in committing the homicide.

The evidence in the case shows that the night prior to the shooting the plaintiff in error and Hopkins visited various saloons together. Upon these trips, according to the story of plaintiff in error, Hopkins was abusing and vilifying him as an officer and threatening to take his life. Notwithstanding these threats Kipley remained with the deceased until a late hour that night. The evidence shows that they were together upon the next morning and met at the apartments of Diamond Lill. If the story of Kipley is true, as soon as Hopkins saw him next morning he dashed toward him with a dagger in his hand and threatened to kill him, and at the same time demanded that Kipley surrender his revolver. After such a threat Kipley put one hand into his pocket and pulled out the revolver and put his other hand into another pocket and took out the cartridges, and there, in the presence of Hopkins, loaded the revolver and handed it to Hopkins, who had just threatened to kill him. This story seems to be very unreasonable and not in accordance with the experience of men of affairs under such circumstances. After the revolver had been handed to Hopkins, Kipley persuaded him to sit down at the table and drink some beer. During the time they were drinking beer Hopkins sat with the dagger in his hand, and all the time was in an angry and ugly mood towards plaintiff in error and Diamond Lill. According to Kipley's own statement he jerked the revolver out of Hopkins' pocket and then ordered him out of the flat and was attacked by Hopkins with the knife, and in his attempt to protect himself from this assault claims that he shot in self-defense. It would seem from the circumstances of the case

as they appeared just prior to the shooting and just after the shooting, that the facts were not as they were claimed by Kipley. After Hopkins was shot, the only weapon found upon him was a very small pearl-handled knife, about the size of a paper knife, which could not be used as a weapon of offense or defense, and this knife was found in his top vest pocket, with a scabbard on it and with the point up. The bullet which struck Hopkins severed his spinal cord, and he was thus paralyzed below the point of the shot. It hardly seems possible that a man being shot as Hopkins was shot could put the knife into the pocket in the position in which it was found by the police. After the shooting Diamond Lill ran out into the hall in a very excited manner and up-braided Kipley for shooting and begged him not to shoot again. Kipley called her vile names and threatened to shoot her. The attitude of plaintiff in error at this moment was not that of a man who had just been compelled to shoot in self-defense, but was rather that of a man who was insane with rage and jealousy. As Hopkins lay upon the floor in a helpless condition Kipley re-entered the room and fired a third shot at the prostrate form, just missing the head. It certainly cannot be said that this last shot was fired in self-defense, but, on the contrary, it would indicate that the whole shooting had been done in cold blood. The wound in Hopkins' body was in such a position as to rebut the presumption of self-defense. The wound was posterior to the axillary line, from two and a half to three and a half inches down from the point of the axilla. In order to receive this wound it would be necessary for Hopkins to be standing, turned over half way around, with his back almost to his assailant. The wound indicates this position, and demonstrates beyond all question that at the time the shot was fired Hopkins was not in the act of assaulting Kipley, but was attempting to ward off a blow. The statement of Hopkins at the hospital to the effect that Kipley did him a dirty, mean trick and that the knife did not belong to him, also indicates

a different state of affairs than that detailed by Kipley. Taking all of the facts and circumstances into consideration we are of the opinion that the jury were fully justified in holding that the plaintiff in error was guilty of manslaughter and that the shooting was not done in necessary self-defense.

The plaintiff in error sought upon the trial to introduce in evidence an indictment returned against Hopkins by the Scott county, Illinois, grand jury, and the proceedings thereunder for his apprehension. This was not offered for the purpose of showing that Hopkins was guilty of an offense, but in order to show the state of mind that Hopkins would be in when approached by a police officer who he might think knew of the pending indictment against him; also for the purpose of indicating Kipley's state of mind in' dealing with a man who he knew was under indictment. Under certain circumstances, evidence of the dangerous, quarrelsome and vicious character of the deceased is admissible. This evidence may be offered where the circumstances of the case make it doubtful whether the homicide was committted in necessary self-defense, in order to show that the defendant may reasonably have believed himself in danger; but in the case at bar Kipley was permitted to state fully his knowledge of Hopkins' alleged character, and Kipley did not attempt to arrest Hopkins, and Hopkins did not believe Kipley was a police officer at the time of the shooting. Hopkins was not killed in resisting arrest, and Kipley for two years prior to the shooting had not been a police officer. From the facts in this case we do not think it was error to refuse to admit the indictment in question.

But it is insisted that the verdict of the jury was the result of erroneous instructions given on behalf of the People, defining the right of self-defense. Section 149 of the Criminal Code provides, that to justify a homicide in self-defense it must appear that "the killing of the other was absolutely necessary." But we have uniformly held that the giving of an instruction in the language of that section is reversible

error, the correct rule being, that if the danger to the accused is apparently necessary to save his own life or to prevent his receiving great bodily harm he may slay his assailant. (*Campbell* v. *People*, 16 Ill. 17; *Enright* v. *People*, 155 id. 32; *Steiner* v. *People*, 187 id. 244; *Carle* v. *People*, 200 id. 494.) The contention is that the instructions given in this case violate the foregoing rule. No one of them given at the request of the People is in the language of section 149, but the objection seems to be that they failed to tell the jury that apparent danger might justify the killing. No. 11 was in the language of sections 148 and 149, and we have held that the two sections taken together properly define the doctrine of self-defense. *Kinney* v. *People*, 108 Ill. 519.

The thirty-fifth and thirty-sixth instructions are criticised as also ignoring the rule as to apparent danger. Neither of them attempts to lay down the doctrine of self-defense, but they simply tell the jury that they should take into consideration all the facts and circumstances surrounding the parties in determining whether or not the killing was in self-defense.

Instruction No. 61 given on behalf of the People is as follows:

"The court instructs the jury that if the People of the State of Illinois in this case have proven by the evidence, beyond a reasonable doubt, each and every one of the following facts, you should find the defendant guilty: First, that somebody is dead; second, that said somebody is Joseph J. Hopkins; third, that said Joseph J. Hopkins came to his death on March 20, in the year 1902, in the county of Cook and State of Illinois; fourth, that the death of the said Joseph J. Hopkins was caused by criminal means in manner and form as charged in the indictment; fifth, that the person who so used criminal means to cause the death of said Joseph J. Hopkins is the defendant, Daniel D. C. Kipley."

It is said this instruction is fatally defective in that it purports to tell the jury of the facts necessary to be proven in order to find the defendant guilty but does not require any

finding on the question of self-defense; that it clearly violates the rule that when the court directs a particular verdict of guilty upon the finding by the jury of certain facts, the instruction must embrace every fact, affirmative or negative, necessary to the guilt of the defendant, and if it excludes or omits any necessary element of his defense it is erroneous, citing *Hoge* v. *People,* 117 Ill. 35, *Illinois Iron and Metal Co.* v. *Weber,* 196 id. 526, *Graff* v. *People,* 134 id. 380, and *Gorrell* v. *Payson,* 170 id. 213.

While the instruction does not directly require the jury to find that the killing was not in self-defense, the fourth clause can be so understood,—that is, if Hopkins came to his death by criminal means in manner and form as charged in the indictment he was not killed in necessary self-defense. By the thirty-fourth instruction given at the request of the defendant the jury were told that the instructions were given and should be considered together as one entire series. The thirty-eighth, thirty-ninth, forty-third, forty-sixth, forty-seventh and forty-eighth given on his behalf each state the law of self-defense in the most direct and positive terms, and the forty-sixth directs the jury that if they entertain a reasonable doubt as to whether the prisoner, at the time of the shooting, was under reasonable apprehension that the deceased intended to inflict upon the defendant great bodily harm, and that he fired the shot in self-defense, then the jury must find him not guilty. Of course, if the sixty-first instruction must be said to positively ignore the question of self-defense it could not be cured by other correct instructions, but if, as we are inclined to hold, it is merely ambiguous and therefore liable to mislead the jury, that tendency or probability is clearly removed by those instructions defining the doctrine of self-defense and applying it to defendant's case. In that view we must, upon an examination of all the instructions, determine whether or not the giving of the sixty-first instruction was such prejudicial error as should reverse the judgment.

We are accordingly of the opinion that, in view of the evidence in this record and the instructions of the court, taken as a whole, the jury could not have ignored the plea of the defendant's self-defense, and therefore the giving of the sixty-first instruction ought not to work a reversal of the judgment, and it will therefore be affirmed.

*Judgment affirmed.*