THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN FRANCIS HUBERT, Plaintiff in Error.

*Opinion filed October 25, 1911.*

1. CRIMINAL LAW—*when a challenge to the array is properly overruled.* A challenge to the array, based upon the ground that the county board had no power to make a jury list at its September meeting before the list made at its previous September meeting was exhausted, is properly overruled, where the record does not show from which list the jurors who tried accused were drawn.

2. SAME—*burden is upon accused to justify or excuse his act in assaulting deceased.* After it is shown that the accused participated in the killing of the deceased the burden is upon him to prove circumstances mitigating, justifying or excusing his acts, and it is the province of the jury to say whether the circumstances proven are sufficient.

3. SAME—*mere fact that person is trespassing on premises does not justify an assault.* The mere fact that a person is trespassing upon the premises of another and looking in the window does not justify the occupants of the premises in making such an assault upon him as to cause his death.

4. SAME—*Supreme Court will not interfere with verdict on the facts unless there is a well founded doubt of guilt.* A verdict of guilty will not be disturbed by the Supreme Court upon the ground of the insufficiency of the evidence unless there is a reasonable and well founded doubt of the defendant's guilt.

5. INSTRUCTIONS—*proof that the killing was by some criminal agency excludes idea of self-defense.* An instruction stating that the prosecution has proved every material allegation of the indictment if it has proved, beyond a reasonable doubt, that the deceased was killed by some criminal agency, etc., and that the defendant had a criminal agency in the crime, is not erroneous as omitting all reference to the elements of self-defense and defense of habitation, since the requirement that the killing was by some criminal agency excludes the idea of such defenses; but such an instruction is useless and should not be given.

6. SAME—*instruction stating that the only question for the jury is one of fact is inaccurate.* An instruction in a manslaughter case stating that the question that the jury had to determine was simply one of fact and was the guilt or innocence of the defendant, and nothing else, is inaccurate, as the jury are the judges of the law as

well as the facts, and the guilt or innocence of the accused is a mixed question of law and fact.

7. SAME—*act of two persons, if with a common intent, is the act of both.* An instruction stating that if the defendant and another person committed the crime charged, acting with a common intent, the crime committed was the act of both, is correct.

8. SAME—*when instruction as to self-defense does not require actual and positive danger.* An instruction stating that "if a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing of the other apparently was absolutely necessary," etc., does not require more than apparent danger to resort to self-defense.

WRIT OF ERROR to the Circuit Court of Clinton county; the Hon. J. C. McBRIDE, Judge, presiding.

FORD & JONES, and WILLIAM JOHNSTON, for plaintiff in error.

W. H. STEAD, Attorney General, HUGH V. MURRAY, State's Attorney, and JOEL C. FITCH, (L. M. KAGY, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error was indicted, together with John McDaniels and Virgil Houck, for manslaughter. McDaniels was tried separately and convicted. On the first trial of the other two defendants the jury disagreed. A second trial resulted in the acquittal of Houck and a disagreement as to the plaintiff in error. A third trial was had and the plaintiff in error was found guilty and sentenced to imprisonment in the penitentiary. A reversal of the conviction is sought for alleged error committed in overruling the challenge of plaintiff in error to the panel of jurors, in rejecting competent evidence, in instructing the jury and in overruling a motion for a new trial.

The challenge to the array of jurors was based upon the fact that the board of supervisors, at the September meeting, 1910, made a jury list composed of not less than one-tenth of the legal voters of each town in the county, when they were not authorized by law to do so. It is insisted that the county board was not authorized to make this list because the list of 1909 had not been exhausted. The record shows that at the September meeting, 1909, the county board made a jury list in accordance with section 1 of the Jurors act, and that the same thing was done in 1910. The record does not, however, show from which list the jurors were actually drawn, and the challenge to the array was therefore properly overruled.

The homicide on which the indictment was based occurred in Frogtown, a hamlet of Clinton county, on the night of October 17, 1908. The plaintiff in error, whose home was near Carlyle, in Clinton county, was then, and had been for a short time, staying in Frogtown, engaged in performing a contract for hauling logs. He occupied a portion of certain property belonging to G. F. Maibaum, having a frontage of 290 feet on a road forming the north boundary of the premises. On the part of the premises not occupied by the plaintiff in error, and near the road, was a dwelling house occupied by Gustav Spittler, the deceased. In the north-east part of the premises, about seventy yards east of the dwelling house, was a blacksmith shop not used for that purpose. There were barns and other out-buildings and the south part of the premises was enclosed by fencing. The plaintiff in error had seven horses, and used the barns, the enclosed part of the premises except the enclosure of the dwelling house, and the blacksmith shop. McDaniels and Houck were in his employ. They were all unmarried. They used the blacksmith shop in which to do their cooking and slept in the hay-mow of the barn. The plaintiff in error was a vigorous young man of twenty-eight years, about five feet eight inches tall. McDaniels was a small

man of about the same age, a cripple, and Houck was a boy of fifteen. Spittler was a strong man, about forty years of age and six feet tall. He and the plaintiff in error were on good terms. He had worked for the plaintiff in error and they had never had any difficulty. About four or five o'clock in the afternoon of the day in question the plaintiff in error, with Henry VanAlst, a neighbor, had gone to Beckemeyer, a village between four and five miles distant. They returned about eight o'clock. While they were gone a difficulty occurred between Spittler and his wife, and their young son summoned McDaniels and Houck, who went to Spittler's place. While there McDaniels threw a brick at Spittler, hitting him on the head and knocking him down. McDaniels and Houck then went back past the blacksmith shop, where they stopped and put out the light, and to Jaske's grocery and saloon, between one hundred and two hundred yards further east. Spittler threatened to shoot McDaniels and Houck, and after they had gone got his gun and fired four shots. Upon his return from Beckemeyer with VanAlst the plaintiff in error was met by McDaniels and Houck, who told him what had occurred. The plaintiff in error went into Jaske's store and tried to borrow Jaske's revolver, but the latter refused to lend it because he did not want to get into trouble and be blamed. He did lend the plaintiff in error a small base-ball bat, a torch and a lantern. Several men were in Jaske's place. One witness testified that the plaintiff in error said, "Let's go down and get him," and that "there was no use for a man like that around here." The plaintiff in error denied saying these things, and insists that he was afraid of Spittler and asked Jaske to go down and see him and "see if he was mad at us or was going to have any trouble with us," but Jaske refused. He then asked the others if they would go along down the road, and a party of seven or eight went down to Spittler's house, taking the torch and lantern. The plaintiff in error called two or three times,

"Oh, Gus!" but got no response. Water was drawn for the horses from the well close to Spittler's house and they were turned into the pasture. The party then went over to the shop, where they all went in and sat talking for a few minutes while the plaintiff in error got his supper. There was a noise in the back yard and Houck and McDaniels went out to learn the cause of it. They returned in a few minutes, saying it was a horse rolling. Soon after, VanAlst, who had continued with the plaintiff in error, started to go to his home on the adjoining lot on the east. Near his house he met his wife, who told him that she had seen Spittler sneaking up to the shop and peeping in at the window on the south side, and it looked as if he was up to some mischief. VanAlst returned and told the others in the shop that Spittler was out back of the shop looking in the window and he thought he had a gun. Four or five feet east of the shop, on the boundary line between that lot and Van-Alst's, was a fence extending south past the shop. There was also a fence between these two lots coming up from the south, which turned to the west just before reaching a point opposite the south-east corner of the shop and extended past the south-east corner of the shop for five or six feet at a distance of two or three feet from it, leaving a gap of this width between the fence and the south side of the shop. From the south-west corner of the shop a fence extended west, having a large gate next the shop. Along the south side of the building were piled scrap iron and broken remnants of vehicles. Spittler, when he was seen by Mrs. VanAlst, came around to the back of the shop and looked in the window. He was there when McDaniels and Houck came out and reported the horse rolling. He lay down close to the shop in the weeds, and when they went back he looked into the window several times again. He had something in his hand, which proved to be a piece of a buggy shaft. When VanAlst reported his presence on the south side of the shop, the plaintiff in error, McDaniels,

Houck and VanAlst went out of the door on the north side and went around the building, Hubert going east, taking his base-ball bat, and the other three going west. VanAlst was behind, carrying a lantern. McDaniels got the handle of a broken hedge-trimmer,—a piece of wood an inch in diameter and eighteen to twenty inches long and with an iron socket on the end,—Houck a piece of fence paling. They all crawled through the fence where a board was off, back of the gate at the south-west corner of the shop. According to VanAlst, when he first saw Spittler the latter was at the opening of the gap between the fence and the shop, facing east and trying to go east through that passage. When McDaniels and Houck found him they struck him with their clubs, and while they were doing so the plaintiff in error came around the south-east corner of the shop. Spittler turned to go back and the plaintiff in error struck him one blow on the head with the bat. Spittler then tried to crawl through the fence, when McDaniels hit him again. VanAlst then seized McDaniels and jerked him back. Spittler got up and then fell down again. He was helped to his house. The plaintiff in error telephoned to the sheriff, who came out from Carlyle and took Spittler into custody. Spittler was kept in jail two days and was then taken to the hospital at Breese. His skull was found to have sustained several fractures, and on October 22 he died.

The testimony differs in details as to what occurred when it was reported that Spittler was back of the shop. McDaniels says that when he first hit Spittler the latter was four or five feet from the gap in the fence, facing him, and had a piece of board or something in his hand, and that he did not turn around but the plaintiff in error hit him while he was still facing west. McDaniels denies that he struck Spittler after the plaintiff in error did. VanAlst says that when they went out the door the plaintiff in error said, "I will go around on the east side," and several witnesses tes-

tify that McDaniels, on finding Spittler, called out, "Here he is!" The plaintiff in error testified that the other three were going west thirty or forty feet ahead of him when he got to the door and he turned east. He heard blows struck but could not tell who was striking, and as he turned the corner he met Spittler coming toward him and struck him one blow. Houck was not called by the People but was examined by the defense. He was not, however, asked anything in regard to what occurred after the return of the plaintiff in error from Beckemeyer.

When the killing of Spittler was shown, the burden of proving circumstances mitigating, justifying or excusing the plaintiff in error devolved upon him, and no such circumstances were shown. It was a technical trespass for Spittler to go upon the premises of the plaintiff in error and look in his window, but the act did not justify an assault upon him. In view of the evidence it was, to say the least of it, a question of fact for the jury as to whether the plaintiff in error was the aggressor, whether there was apparently any reasonable cause for him to apprehend serious danger to himself, his premises or any one on his premises, and whether he used excessive force in repelling Spittler's intrusion upon his premises. Whether the circumstances shown were such as to raise a reasonable doubt of the guilt of the plaintiff in error it was the special province of the jury to determine. With their determination the court will interfere only where there is clearly a reasonable and well founded doubt of the defendant's guilt. (*Gainey* v. *People,* 97 Ill. 270; *Steffy* v. *People,* 130 id. 98; *People* v. *Williams,* 240 id. 633). The court did not err in overruling the motion for a new trial on account of the insufficiency of the evidence.

The evidence which it is contended the court erroneously rejected related to what occurred between Spittler and his wife, McDaniels and Houck. That transaction, so far as it was of any importance, was sufficiently disclosed

by the evidence. It was also shown that it was reported to the plaintiff in error. In his own testimony, after having stated what McDaniels and Houck told him, the plaintiff in error went on to state his own comment that it was a pretty dangerous case. This was properly excluded by the court, even conceding that what had already been stated was properly admitted.

Objection is made to a number of the instructions. In one the jury were told that it was necessary for the prosecution to prove that Gustav Spittler was killed by some criminal agency, that such killing was within the county at or about the time stated and in manner and form as charged in the indictment, and that the defendant had a criminal agency in the crime, and if these allegations were proved beyond a reasonable doubt, the prosecution had established, beyond a reasonable doubt, all the material allegations of the indictment. The first criticism of this instruction, that it assumes that a criminal agency was used, is unfounded in fact. The second, that it omits all reference to the element of self-defense or defense of habitation, is without force, because the requirement that Spittler was killed by some criminal agency excludes the idea that he might have been killed in self-defense. (*Kipley* v. *People,* 215 Ill. 358; *Morello* v. *People,* 226 id. 388.) This kind of instruction ought not to be given. It furnishes no information of any value to the jury, defines no principle of law for their guidance and can be of no assistance to them in applying the law to the evidence. It is useless, if not confusing. The law of self-defense was, however, given to the jury in other instructions, and in spite of this one the jury could not have been misled as to the law of the case.

Another instruction told the jury that they had nothing to do with and should not consider the punishment the defendant might receive if found guilty; that the question they had to determine was simply one of fact, and was to determine as to the guilt or innocence of the defendant and

nothing else. The instruction is inaccurate, for the jury are judges of the law as well as the facts, and the question of the guilt or innocence of the defendant is one of mixed law and fact. The object of asking such an instruction is not apparent and it should not have been given, but it could not have done the defendant any harm.

Another instruction complained of properly told the jury that if the plaintiff in error and McDaniels committed the crime charged, acting with a common intent, the crime committed was the act of both.

The court gave to the jury, as an instruction, section 144 of the Criminal Code, referring to voluntary manslaughter, omitting the last four words, "and punish as murder." The indictment was for manslaughter, only, and not murder. The words omitted were not material to this case. It is objected that the section was not applicable to the case. The defense was based upon the theory of self-defense and defense of habitation. If this instruction was not applicable to the case, then the plaintiff in error had no defense and the instruction did him no harm. If there was no assault made upon or provocation given him, then there is no semblance of justification for the homicide.

An instruction was given as follows:

"The court instructs the jury that if a person kill another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life or to prevent his receiving great bodily harm the killing of the other apparently was absolutely necessary; and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given."

The objection made to this instruction is, that actual and positive danger is not necessary to justify self-defense. This is undoubtedly true, and the instruction requires no more than apparent danger to justify a resort to self-defense. If the word "apparently" were transposed, so that

the instruction would read, "the danger was apparently so urgent and pressing," etc., there could be no question in regard to the instruction. However, in either form the meaning is, that it must appear to the accused that the danger was so urgent and pressing that it was absolutely necessary to kill the other to save his own life or to prevent his receiving great bodily harm. As said with reference to the previous instruction, if there was no evidence on which to base this instruction then there was no defense.

Two other instructions were based on the theory that the assault upon the deceased was made for the purpose of inflicting punishment upon him, and they were justified by the evidence.

*Judgment affirmed.*